UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

_____
                                              )
**BRETT LILLEMOE**                            )
392 Mississippi River Blvd. N,                )
Saint. Paul, MN 55104                         )
                                              )
**GTR, LLC**                                  )
392 Mississippi River Blvd. N,                )
Saint. Paul, MN 55104                         )
                                              )
                                  Plaintiffs, )
                        v.                    )
                                              )   Case No. 1:15-cv-02047-TSC
**UNITED STATES DEPARTMENT OF**               )
**AGRICULTURE, FOREIGN AGRICULTURAL**)
**SERVICE**,                                  )
1400 Independence Avenue, SW                  )
Washington, D.C. 20250                        )
                                              )
**PHILLIP MARK ROWSE**,                       )
968 Melvin Road                               )
Annapolis, MD 21403                           )
                                              )
**JONATHAN L. DOSTER**                        )
1300 Army Navy Drive, Unit 608                )
Arlington, VA 22202                           )
                                              )
                                  Defendants. )
_____)

**FIRST AMENDED COMPLAINT**

This is an action under the Administrative Procedure Act and the Fifth Amendment of the

United States Constitution ("Fifth Amendment") for declaratory relief, reimbursement and other

appropriate relief as a result of the arbitrary, capricious and unconstitutional conduct of the

United States Department of Agriculture ("USDA") and its component the Foreign Agricultural

Service ("FAS").  Further, Plaintiffs have brought claims under *Bivens v. Six Unknown Named*

*Agents of Federal Bureau of Narcotics,* 403 US 388 (1971) seeking money damages and other

appropriate relief because of the tortiously unconstitutional conduct of individuals employed by

FAS, Phillip Mark Rowse and Jonathan L. Doster.  FAS and individuals within FAS violated Plaintiffs' Fifth Amendment equal protection rights by refusing to apply FAS regulations and policies equally to the major agribusiness and trade financing companies which also participate in the Export Guarantee Program (GSM-102) ("Program") and are similarly situated to Plaintiffs. Defendants unconstitutionally disparate treatment of Plaintiffs without any rational basis drove Plaintiffs out of the Program and permanently decimated Plaintiffs' entire structured trade finance business.

**Jurisdiction and Venue**

1.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over the defendants pursuant to 28 U.S.C. § 1331.  This court also has jurisdiction over this action pursuant to 5 U.S.C. § 703.  Venue lies in this district under 28 U.S.C. § 1391(b)(2).

2.      Plaintiff Brett Lillemoe is an individual, residing at 392 Mississippi River Blvd. N, Saint Paul, MN 55104.  FAS and the named individuals treated Mr. Lillemoe unequally under the law, ruining his reputation, business and livelihood in violation of his rights under the Fifth Amendment.

3.      Plaintiff GTR, LLC ("GTR") is a Minnesota LLC corporation, doing business at 392 Mississippi River Blvd. N, Saint. Paul, MN 55104.  FAS and the named individuals treated GTR unequally under the law, interfering with and diminishing the value of its business, in violation of its rights under the Fifth Amendment.

4.      Defendant USDA is a Department of the Executive Branch of the United States Government, and includes the component entity FAS.  USDA and/or FAS are agencies within the meaning of 5 U.S.C. § 552(f).

2

5.      Defendant Phillip Mark Rowse is, on information and belief, an employee of USDA or FAS.  At all relevant times, Mr. Rowse was the Director of the Credit Programs Division at FAS.

6.      Defendant Jonathan L. Doster is, on information and belief, an employee of USDA or FAS.  At all relevant times, Mr. Doster worked in the Credit Programs Division of FAS.

**Purported Purpose of the Program and Outline of a Program Transaction**

7.      FAS administers the Program on behalf of the Commodity Credit Corporation ("CCC"), pursuant to 7 U.S.C. § 5622 and 7 CFR § 1493, *et seq.*  As Director of the Credit Programs Division during the relevant time period, Mr. Rowse approved or denied applications to the Program.

8.      According to FAS, the purpose of the Program is to finance commercial export of agricultural products: "The GSM-102 program provides credit guarantees to encourage financing of commercial exports of U.S. agricultural products.  By reducing financial risk to lenders, credit guarantees encourage exports to buyers in countries—mainly developing countries—that have sufficient financial strength to have foreign exchange available for scheduled payments." (USDA/FAS website, http://www.fas.usda.gov/programs/export-credit-guarantee-program-gsm-102 (November 17, 2015).)

9.      The Program guarantees billions of dollars of credit per year.  The credit is extended by the private financial sector in the United States to approved foreign banks through the refinancing of irrevocable documentary letters of credit ("LCs") issued in connection with exports of U.S.-origin agricultural products.

3

10. CCC issues the credit guarantees to exporters as determined by FAS. CCC guarantees payments due from approved foreign banks to exporters or their assignees, *e.g.,* banks in the United States.

11. The Program only applies to eligible countries or regions, as selected by CCC. Similarly, CCC determines the agricultural commodities and products that qualify for guarantees.

12. CCC qualifies U.S. exporters before they are allowed to participate in the Program. Both U.S. and foreign banks also must meet established criteria and be approved to participate in the Program. CCC determines and monitors credit limits for each of the approved foreign banks. CCC does not determine importer eligibility.

13. According to FAS, in a typical transaction, the registered U.S. exporter negotiates terms of or identifies an export sale with an importer in an approved country or region. Once a firm export sale exists, the registered U.S. exporter applies to CCC for a GSM-102 guarantee on or before the date of export. An application must contain the information required by 7 CFR § 1493.40.[1]

14. As part of the process, the exporter pays CCC a fee calculated on the dollar amount guaranteed. Fee rates can vary based on a number of factors, including, for example, the country risk that CCC is undertaking, risk of the foreign bank and the repayment terms of the loan extended to the foreign bank by the U.S. bank.

15. As administrator of the Program, FAS approves or denies GSM-102 applications. During the time period relevant to this Complaint, FAS could, pursuant to 7 CFR §1493.40(b), approve the application as submitted, approve the application with modifications agreed to by the

---

[1]The GSM 102 regulations were amended on November 18, 2014 (effective date December 18, 2014). Because much of the conduct in this Complaint was under the old regulations, a copy of the GSM-102 regulations as they existed prior to December 18, 2014 is attached as Ex. A.

exporter or reject the application. Phillip Mark Rowse, as Director of the Credit Program Division, is the individual who made this determination with respect to applications submitted by GTR. The GSM-102 regulations contained no provisions to appeal FAS application determinations prior to December 18, 2014.

16. After a GSM-102 guarantee is approved, the foreign bank at the request of the importer or intervening purchaser identified on the GSM-102 application ("GSM Importer" or "Intervening Purchaser") issues a dollar-denominated, irrevocable LC in favor of the U.S. exporter on the GSM-102 application ("GSM Exporter"), which also is usually confirmed by a bank in the United States agreeing to extend credit to the foreign bank.

17. The Program allows the foreign bank to refinance its obligations under the LC and repay the U.S. bank on deferred terms as stipulated in the language of the LC. If the foreign bank fails to make any payment covered by the GSM-102 guarantee, the holder of the payment guarantee (normally the U.S. bank) may submit a notice of default to CCC and seek payment on the claim.

**FAS's Knowledge and Approval of the Evolving Transaction Structure under the Program**

18. While the stated purpose of the Program is to encourage the financing of U.S. commodity exports to selected foreign markets, in fact the Program neither finances exporters nor importers. Instead, the Program guarantees loans from U.S. banks to foreign banks in selected emerging market regions. In the vast majority of Program transactions, the foreign banks use the funds for purposes unrelated to the purchase of U.S. agricultural exports.

19. Such loans, which do not finance the purchase of U.S. agricultural exports, are accomplished with so called "synthetic" LCs. Furthermore, in many Program synthetic LC transactions, neither the GSM Exporter nor the GSM Importer are in any way involved in the

export of the physical goods, instead they use the shipping documents of unrelated U.S. exporters to create the synthetic LCs.  In the structured trade finance industry, such practice is referred to as "renting trade flows."

20.    In contrast with typical LCs, synthetic LCs do not pay for the purchase of goods. When a foreign bank issues synthetic LCs, it does not extend credit to the "buyers," as it does when it issues typical deferred payment LCs, because the purpose of the synthetic transactions is solely to finance the foreign bank.  Banks choose to fund themselves with synthetic LCs over funding with other financial instruments because interest rates on synthetic LCs are lower.  If the funds are guaranteed by the U.S. government, as is the case in Program transactions, the interest rate is dramatically reduced.

21.    In synthetic LC transactions, the GSM Exporter and the GSM Importer or Intervening Purchaser do not engage in an arm's length sale of physical goods.  Rather, they engage in a "financial sale" between collaborating parties.  The financial sale is separate and distinct from the physical sale of goods, and in general the foreign buyer of the physical goods is not aware of the synthetic LC transaction.  The GSM Importer or Intervening Purchaser, the "financial buyer," applies for an LC with a foreign bank.  In order to get paid up front by a U.S. bank, the GSM Exporter, the "financial seller," presents photocopies of bills of lading ("BLs") and a commercial invoice between the GSM Exporter and its collaborating GSM Importer/Intervening Purchaser.  Upon receipt of funds from the U.S. bank, the GSM Exporter forwards the funds to the foreign bank on behalf of its collaborating financial buyer.  The end result is: (1) the U.S. bank finances the foreign bank, and (2) the exporter group—*i.e.*, the GSM Exporter and GSM Importer, often related companies—receives a fee from the foreign bank for facilitating the foreign bank's access to unrestricted, low interest rate funds.  The GSM Importer

6

or Intervening Purchaser pays the foreign bank while not receiving any goods, and the GSM Exporter is paid by the U.S. bank without delivering any goods.

22.     Before 2002, GSM Exporters would use their own physical shipments for synthetic LC transactions in the Program.  These transactions monetized the value of guarantees by effectively selling the credit protection of the Program to a foreign bank unrelated to the physical shipments to which the synthetic LC referred.  The Program had spare capacity as many U.S. agricultural commodity exporters, large and small, did not have the financial expertise nor the international banking relationships to effectively participate in the Program.  Starting in 2002 the technique of renting trade flows became widely used in the Program's synthetic LC business.  This technique enabled GSM Exporters to utilize the shipments of non-participant Actual Exporters and thereby extend Program benefits to this large sector of U.S. agricultural exporters.

23.     When a GSM Exporter rents a trade flow, the GSM Exporter obtains the right to use photocopies of the Actual Exporter's shipping documents (including BLs) in a Program transaction.  In exchange, the GSM Exporter pays a "rental" fee.  The "rental" agreement between the Actual Exporter and the GSM Exporter is typically documented as a simultaneous and offsetting sale and repurchase, with the net effect being that the Actual Exporter does not sell the physical goods to the GSM Exporter.  The Actual Exporter and/or an intermediary benefits from the Program by renting the trade flows to a GSM Exporter for consideration, and that GSM Exporter then uses the Actual Exporter's BLs in a Program transaction.

24.     In all cases of rented trade flows there is an actual shipment of an agricultural commodity that meets the parameters of the applicable GSM guarantee, and precautions are taken to prevent the shipment from being double-counted under the Program, *i.e.*, not used to obtain multiple GSM guarantees.  However, the parties on the GSM application and guarantee

7

(GSM Exporter and GSM Importer) are not the parties that shipped and received the agricultural commodity as represented on the bills of lading for the underlying transaction (Actual Exporter and Consignee).

25.     The structured finance mechanism utilizing synthetic LCs and trade flow rentals was explained and presented to FAS as early as 2002 by Cargill.  FAS did not object to it then or indicate that it would not allow such transactions under the Program.  Indeed, FAS has vetted and approved thousands of such transactions over the past 13 years.

26.     GTR also has repeatedly disclosed its business model and the structure of its transactions utilizing synthetic LCs and rental of trade flows.

27.     In particular, on May 12, 2009, on behalf of GTR, Mr. Lillemoe and Stanley McDermott, an attorney representing Globex International, Inc. ("Globex"), met with Phillip Mark Rowse, the Director of the Credit Program Division at FAS, and Peter Bonner, a USDA attorney, to explain how transactions in the Program were structured utilizing rented trade flows. The purpose of the meeting was to seek FAS's confirmation that this widely-used technique was legitimate in order to assure GTR's potential new client Globex, a large trader of poultry primarily targeted for Russia and other former Soviet countries, that FAS would approve GSM-102 guarantees utilizing rented trade flows.

28.      During the May 12, 2009 meeting, Mr. Lillemoe and Mr. McDermott explained the transaction structure to Mr. Rowse and Mr. Bonner, even using a diagram to make it clear to FAS what was happening in the transaction.  (*See* Diagram, attached as Ex. B.)  The diagram showed GTR "renting" a trade flow from Globex (Actual Exporter), and it included a description of GTR buying, and a GTR affiliate reselling, the goods to Globex on "back-to-back" terms.  Mr.

8

McDermott verbally emphasized the fact that the goods were being sold "back up the chain" to Globex.

29.     The diagram and the accompanying description clearly illustrate that Globex and its customer were not directly involved in the GSM-102 transaction and that GTR had no relationship with Globex's customer, the Consignee.  Rather, Globex rented trade flows to GTR for use in the Program.  The description also stated explicitly that the GSM transaction would result in the foreign bank obtaining a loan from the US bank at below-market interest rates due to the GSM guarantee.  In that meeting Mr. Lillemoe informed Mr. Rowse and Mr. Bonner that the structure depicted in the diagram represented how nearly all, if not all, transactions were being executed under the Program in Russia/Eurasia.

30.     To the extent FAS had not previously considered the use of rental flows in the Program, FAS fully vetted it internally after the May 12, 2009 meeting with Mr. Lillemoe/GTR and GLOBEX.  FAS's legal counsel indicated in internal FAS communications in May 2009 that the transaction structure and the use of rented trade flows did not violate the Program's regulations.  This position was consistent with what Mr. Rowse had verbally communicated to Mr. Lillemoe and Mr. McDermott in the meeting itself.  Further, FAS did not communicate to Mr. Lillemoe or GTR that the use of rented trade flows was inconsistent with the requirements of the Program.  In fact, subsequent to the May 12, 2009 meeting, FAS approved GTR's Russia and Eurasia GSM-102 guarantees, including transactions with GLOBEX, all of which utilized rental flows.  Meanwhile FAS also continued to approve the rented trade flow transactions of other participants that appeared on their face no different than GTR's transactions.

9

31.     Given GTR's relatively small position in the market, GTR believes that FAS has repeatedly discussed synthetic LC transactions utilizing rented trade flows with other participants in the Program.

32.     FAS has paid claims on defaulted transactions in Argentina in 2002, Russia in 2004, Ukraine in 2008, Kazakhstan in 2009 and Russia in 2010.  In all of these cases, synthetic LCs and rented trade flows were employed, and regarding the claims for Russia/Ukraine/Kazakhstan, rented trade flows represented an overwhelming majority of transactions.  When a registered exporter on a GSM-102 guarantee or its assignee submits a claim for payment on the guarantee after a foreign bank default, the claimant must submit additional documentation of the transaction, including the foreign bank LCs and the BLs or their equivalent.

33.     FAS scrupulously checks the documents supporting a claim of default.  In doing so, FAS necessarily observed that the defaulted transactions were consistent with renting trade flows because the BLs and the foreign bank LC would reveal that parties other than the exporter and importer on the GSM-102 guarantee were involved in the physical export and import of the commodity.  Redacted copies of FAS's claim checklists that have been obtained through a FOIA action confirm that FAS routinely noted the transactions were "3rd-party"—meaning using rented trade flows—as evidenced by the disparity between the BL parties and GSM parties.  (*See* Claim Checklist, December 3, 2010 at FAS008606, attached as Ex. C; Claim Checklist, January 21, 2011 at FAS002283, attached as Ex. D.)

34.     Further, FAS has been aware of parties engaging in trade flow rental transactions because at least some of the other large agribusiness companies, such as Cargill Incorporated,

have acknowledged that it is used in the Program and complained about smaller companies, such as GTR, engaging in equivalent Program transactions.

35.    FAS sought industry comments on Program operations in a request published in the Federal Register on December 18, 2008 ("Participant Request").  Cargill's Karla Hennessey submitted to Mr. Rowse a detailed response to the Participant Request on January 30, 2009.  (*See* Comments in Response to FAS Participant Request, attached as Ex. E.)  In this response, Cargill lobbies fiercely for FAS to rid the Program of pesky competitors like GTR, which Cargill describes as "low cost financial brokerage organizations who have no infrastructure or investments in the local country, but instead are merely renting trade flows…" (*Id.* at Page 3 of 7).  In other words, "entities Cargill feels should not be allowed to participate in the program." (*Id.* at Page 2 of 7.)

36.    One of FAS's questions was whether CCC should put in place more specific and rigid criteria for GSM Exporters.  (*Id.* at Page 5 of 7.)  Cargill responded on January 30, 2009 that

> CCC allocations have been awarded, in very large volume, to companies established by and consisting of only a small number of financial traders who are not in the business of trading commodities.  These entities purchase goods from, and resell goods to, small commodity export companies for the sole purpose of earning the economic incentive offered by the CCC program.

(*Id.*)  Cargill commented that it "did not have an issue with the process itself," *i.e.*, renting trade flows, "and in fact, it is one we have discussed with the General Sale Manager (Mr. Rowse's superior) and utilize in certain markets where we have a robust financial business with the local banks but may have a shortfall in trade flow volume." (*Id.*)

37.    However, according to Cargill, the difference between a small trade finance company, such as GTR, and Cargill is that Cargill is "a key player in the agricultural and

11

financial business," while the trade finance companies, "are not involved in the global trade of commodities." (*Id.*) But, Cargill's complaint boils down to the simple fact that GTR was beating them in the market: "In many markets, we see these companies drive market pricing down by charging issuing banks below market rates. This lack of pricing discipline diminishes the value of the program for all participants," *i.e.,* the large agribusiness companies, such as Cargill. (*Id.*)

38.    In its response to the Participant Request, Cargill warned FAS about the potential consequences if FAS did not make changes to how it implemented the Program vis-à-vis smaller participants, such as GTR: "should the benefit of the program ever be challenged at a Congressional level, it would seem difficult to defend why these entities, which are not commodity businesses and do not export goods, are allowed to qualify as participants under the program. The program is quite important to commodity exporters such as Cargill and we would not want to risk its elimination as a result of what could be viewed as inappropriate use of GSM allocations by purely financial traders." (*Id*. at Page 5-6 of 7.)

**Mr. Lillemoe's and GTR's Participation in the Program**

39.    For more than fifteen years, through GTR and various other entities, Mr. Lillemoe has participated in the Program. GTR has been a registered exporter under the Program since 2007 and GTR's predecessor Global Trade Resources LLC, of which Mr. Lillemoe was a principal, became a registered exporter in 1999. FAS had never debarred GTR or any entity represented by Mr. Lillemoe, or taken any other action against GTR or any entity represented by Mr. Lillemoe to change its registration status, until May 2015. FAS's suspension action was in response to Mr. Lillemoe's indictment in February 2015.

40.    As a registered exporter, GTR had the right and ability to participate in the Program by submitting applications to obtain GSM-102 guarantees.

41.    Between 1999 and 2012, FAS approved and CCC issued more than 500 GSM-102 guarantees to Global Trade Resources LLC, GTR and affiliates thereof.  One hundred percent of the transactions executed under those guarantees utilized rented trade flows.  Neither Global Trade Resources, LLC nor GTR have ever appeared anywhere on a single bill of lading, certificate of origin, veterinary certificate, weight or quality certificate, or any other document related to the physical export of a shipment.

42.    Between 1999 and 2008, Mr. Lillemoe also represented other Program participants, either as an agent or as an employee, including AGF Trading LLC, Trade Resources LLC, ADM-ACTI Trade Resources, Inc. and Agri Commodity Trade LLC.  One hundred percent of the Program transactions Mr. Lillemoe executed on behalf of these GSM exporters utilized synthetic LCs and approximately fifty percent utilized rented trade flows.

43.    Global Trade Resources LLC, GTR and affiliates thereof have since 1999 been subject to GSM-102 compliance reviews.  During those reviews, FAS had the ability to and did review all documents associated with the GSM-102 transactions, including bills of lading, contracts and letters of credit.  Those documents clearly identify the transactions as utilizing rented trade flows and synthetic LCs.  Mr. Lillemoe and GTR have never received from FAS a single complaint, question, or request for clarification resulting from any compliance review.

44.    Other than for a lack of Program availability or foreign bank limit availability, FAS had not rejected any applications submitted by GTR or any other registered exporter affiliated with Mr. Lillemoe until December 28, 2012.

**FAS's and Mr. Rowse's Unlawful and Unconstitutional Actions Toward GTR and Mr. Lillemoe**

45.    On October 31, 2012, for the first time ever, Mr. Rowse sought additional information with respect to and questioned the structure of GTR's GSM-102 transactions.  (*See*

Letter from P. M. Rowse to B. Lillemoe, dated October 31, 2012, attached as Ex. F.) FAS had issued a number of guarantees to GTR between December 1, 2011 and May 10, 2012 relating to shipments of breeding cattle (and one shipment of breeding horses) to Russia. In particular, Mr. Rowse inquired about the consignee on the bills of lading being different from the importer on the GSM-102 Guarantee and the respective roles played by those two entities in the subject transactions. (*Id.*, ¶¶ 3-4.)

46. Mr. Rowse sought this information in the context of fifteen new and pending GTR GSM-102 applications, submitted by GTR to FAS on October 24, 2012, that involved similar transactions and shipments of breeding animals to Russia.

47. Mr. Lillemoe was surprised by the request because he had spoken around this time with another GSM exporter that had also submitted GSM applications for Russia on October 24, 2012, exactly as GTR had, also using the rented trade flow structure equivalent to that employed by GTR for its Russian cattle registrations. By early November, within two weeks of the October 24 application date, this other GSM exporter had received from FAS its GSM guarantee numbers and guarantees—all approved with the signature of Mr. Rowse—with no inquiries nor unusual delays whatsoever.

48. Nevertheless, as requested, Mr. Lillemoe responded to Mr. Rowse's inquiry within 10 days. Mr. Lillemoe's attorney explained the structure of the past transactions and how it was materially the same as the structure discussed with Mr. Rowse and FAS's attorney on May 12, 2009. The Russian cattle exports used rented trade flows, with a simultaneous purchase and sell-back to the party supplying the shipping documents, consistent with the structure that had been used by GTR and the majority of participants in the Program with FAS's and Mr. Rowse's knowledge for more than a decade.

49.     After additional communications between Mr. Rowse and GTR in which Mr. Lillemoe confirmed that GTR's pending GSM-102 Russia applications were based on the use of rented trade flows and a further 24-day delay, Mr. Rowse denied those GSM-102 applications on December 28, 2012.   (Letter from P.M. Rowse to B. Lillemoe, dated December 28, 2012, attached as Ex. G.)

50.     Mr. Rowse purportedly denied the applications on the ground that the cattle would not be shipped to the GSM Importer identified in the GSM-102 application, and that the GSM Importer had no relationship with the Consignee on the related bills of lading.  (*Id.*)  Moreover, Mr. Rowse stated that "any future applications utilizing the same structure will also be denied." (*Id.*)

51.     On January 2, 2013, Mr. Lillemoe, on behalf of GTR, responded that he would not appeal the decision because "it is clear to us that the USDA no longer approves of the structures in these applications."[2]

52.     In January 2013, Mr. Lillemoe took Mr. Rowse and FAS at their word.  Mr. Rowse's explanation for the denial of the applications and statement that "any future applications utilizing the same structure would also be denied" made it clear to Mr. Lillemoe that the use of the rented trade flow structure, which was vetted with FAS by Mr. Lillemoe on May 12, 2009 and utilized extensively in the Program for a decade, was finished.  Further, it was clear to Mr. Lillemoe that Mr. Rowse and FAS would no longer approve any transaction in which the GSM Importer could not establish some relationship with the Consignee on the BL.  Mr. Lillemoe recognized this determination as a momentous change for the Program.

---

[2] While the Program regulations did not include any process for appeal of FAS's determinations under the Program, FAS indicated in the December 28, 2012 letter that Mr. Lillemoe could appeal the decision within 15 days.  *See* Ex. A.

53.     Indeed, Mr. Lillemoe committed to doing what he thought Mr. Rowse and FAS now demanded.  He relied on their determination.  In his January 2, 2013 letter, he identified three additional GSM-102 applications for Turkey that used rented trade flows without a relationship between the GSM Importer and the Consignee, and he withdrew them, informing his customers that the transactions are no longer covered by the Program.  Mr. Lillemoe requested that FAS refund the $122,719.50 of fees paid by GTR for these three Turkey applications, just as FAS had refunded the fees GTR had paid for the denied Russian cattle applications. After all, Mr. Rowse's determination of December 28, 2012 rendered these Turkey guarantees useless to GTR. Attempting to utilize them would have placed GTR and Mr. Lillemoe in clear violation of FAS's purported new rules.  FAS did not grant this refund, nor did it provide an explanation for its refusal to do so.

54.     In January 2013, Mr. Lillemoe did not know that Mr. Rowse had misled him and GTR, and that it was business-as-usual for other participants even after the December 28, 2012 letter denying the viability of renting trade flows under the Program.  In hindsight, it appears that Mr. Rowse and FAS, including employees of FAS working under Mr. Rowse, were determined to put GTR and Mr. Lillemoe out of business.

55.     In his January 2, 2013 response to FAS, Mr. Lillemoe also requested that FAS move forward with three transactions in South America in which the GSM Importer did have a relationship with the Consignee on the bills of lading.  Based on the December 28, 2012 letter, Mr. Lillemoe understood that FAS would accept this transaction structure going forward.

56.     GTR had applied for and paid FAS for these three South America guarantees on December 14 and December 17, 2012.  Normally, FAS responded and confirmed guarantees within a week, if not one to two days.  However, FAS had still not furnished GTR with the

signed guarantees needed to execute its GSM transaction by the time of Mr. Lillemoe's January 2, 2013 letter.

57. Based on FAS's common practices, the foreign bank, Bancolombia in Bogota, Colombia, had expected the LC to be issued and refinanced shortly after shipment date, and by the first few days of January at the very latest. After fielding urgent calls from Bancolombia from January 1 on as to status of this transaction, Mr. Lillemoe pleaded with Mr. Rowse to provide the signed guarantees. Mr. Rowse did not respond. Mr. Rowse finally authorized the issuance of the three Bancolombia guarantees to GTR on January 10.

58. Because of the delay, Bancolombia had been left with no option other than to execute the transaction with a competitor of GTR.[3] GTR was left to attempt to repair its damaged relationship with Bancolombia, a relationship that it took Mr. Lillemoe years to build. FAS also refused to refund GTR's fees for one of the Bancolombia guarantees (GSM-102-826350).

59. Mr. Lillemoe started to hear from his customers and other GSM participants that Mr. Rowse and FAS continued to approve GSM-102 applications using rented trade flows. None of them had received any inquiries from Mr. Rowse or FAS regarding their transaction structures. None had experienced any unusual delays by Mr. Rowse or FAS. On February 20, 2013, Mr. Lillemoe brought John Josserand, owner of AzTx, the cattle exporter who was a party to the guarantees denied on December 28, 2012, to meet with Mr. Rowse, Amy Slusher, Jon Doster and other members of Mr. Rowse's team to discuss the denial of the guarantees.

60. At the meeting, Mr. Rowse reiterated that the use of the rented trade flows similar to the proposed transactions between GTR and AzTx was impermissible under the GSM-102

---

[3] Mr. Lillemoe found out much later that this competitor executed the transaction with Bancolombia using rented trade flows, which Mr. Rowse had denied for GTR, in the amount of approximately $25 Million, to replace the transaction that GTR could not deliver.

17

regulations. He would not reconsider his decision. Mr. Rowse claimed that FAS's concern was the risk that two or more parties might each apply for a GSM-102 guarantee based on the same shipment or BL. Mr. Rowse stated that FAS instead wants participants to register transactions utilizing a "linear" structure, in which the GSM Importer has some direct link to the Consignee— the final buyer of the goods.

61.     Mr. Lillemoe then told Mr. Rowse that he had heard that FAS continued to approve applications of other participants that did not meet Mr. Rowse's "linear" structure requirements, *i.e.* that used rented trade flows where the GSM Importer had no relationship to the Consignee. Mr. Lillemoe stated to Mr. Rowse, "nobody is asking Bunge what they're doing with Swift and Farmland," referring to the parties regularly renting trade flows of frozen meat to GSM Exporter and GTR competitor Bunge. Mr. Josserand asked why Cargill can operate under the Program in exactly the same fashion that has been declared impermissible for AzTx/GTR. Mr. Rowse's only response to Mr. Lillemoe and Mr. Josserand was "we are having the same conversations with all parties."

62.     Mr. Lillemoe left the meeting with Mr. Rowse and FAS understanding that FAS's December 28, 2012 position had not changed *and* that FAS was in the process of informing all participants in the Program that using rented trade flows was impermissible.

63.     Over the course of the next several months, Mr. Lillemoe would realize that FAS, through Mr. Rowse, purposefully had misled him. Mr. Lillemoe was not aware of FAS having any conversations with other participants that rented trade flows were impermissible.. Mr. Rowse continued to approve GSM-102 applications and direct CCC to issue GSM-102 guarantees based on transactions using rented trade flows, where there was absolutely no relationship between the GSM Importer and the Consignee. Mr. Lillemoe is not aware of any

18

other GSM Exporters being asked to prove a relationship between the GSM Importer and the Consignee.

64.     Months after the February meeting with Mr. Rowse, GTR and AzTx, Mr. Lillemoe learned that AzTx was approached by Grove Services, LLC ("Grove") who proposed the same rented trade flow structure AzTx had used with GTR previously. Shortly thereafter, Grove executed a Program transaction by renting a trade flow from AzTx. The transaction structure is displayed on the last page of a presentation provided by Grove to AzTx, which explains specifically the "flow rental fee" to be paid by Grove to AzTx for use of the trade flow under the Program. (*See* Grove Services Presentation, attached as Ex. H at 12.) Grove even used GTR's form buy/sell contracts that were previously executed between GTR and AzTx under the transactions denied by FAS, and merely switched the letterhead from GTR to Grove. The subject shipments were exactly the same AzTx cattle shipments that GTR had attempted to register on October 24, 2012, which were subsequently denied by FAS. Grove applied for and received a GSM-102 Guarantee for these transactions on May 29, 2013. (*See* Side-by-side comparison of Grove/AzTx and GTR/AzTx transaction documents, attached as Ex. I.) The comparison illustrates how the Grove/AzTx transaction allowed by Mr. Rowse in May 2013 is materially a carbon-copy of the GTR/AzTx transaction prohibited by Mr. Rowse in December 2012. (*Id.*)

65.     On the chance that this was a one-off mistake by FAS, a business partner of Mr. Lillemoe, Pablo Calderon, wrote to Mr. Rowse on July 20, 2013, informing FAS that the transactions engaged in by Grove were identical to the transactions that Mr. Rowse and FAS had denied on December 28, 2012. (*See* P. Calderon letter to P. M. Rowse, dated July 20, 2013, attached as Ex. J.) Mr. Calderon received no response from Mr. Rowse or FAS.

19

66.    In December 2013, Mr. Calderon wrote to Phyllis Fong, the Inspector General of USDA, because he and Mr. Lillemoe had learned of two additional transactions by Grove in September 2013 that used rented trade flows. (*See* P. Calderon letter to P. Fong, dated December 10, 2013, attached as Ex. K.) Mr. Rowse received no response from Ms. Fong, FAS or USDA. Over the subsequent months, it became clear to Mr. Lillemoe that FAS was selectively applying its December 28, 2012 decision and purposefully prohibiting only GTR from engaging in such transactions.

67.    Mr. Lillemoe has learned of additional transactions in 2013 that used rented trade flows and has more recently become aware of FAS continuing to approve guarantees for multiple participants utilizing the same purportedly prohibited structure throughout 2014 and 2015, and into 2016. These transactions represent hundreds of millions of dollars of Program usage during these years.

68.    Consistent with their delay in December 2012 and January 2013 with respect to approving GTR's GSM-102 guarantees for Bancolombia, FAS and Mr. Rowse continued to pursue a course of action to drive Mr. Lillemoe and GTR out of the Program completely.

69.    FAS and Mr. Rowse made it difficult for Mr. Lillemoe to engage in business even using the structure requested by Mr. Rowse at the February 2013 meeting by defaming GTR and Mr. Lillemoe to his business associates and customers and by interfering in his business relationships.

70.    Mr. Lillemoe had several transactions to sell cattle to Russia moving forward under the structure Mr. Rowse had requested where Deutsche Bank New York would negotiate the letter of credit issued by the foreign bank. After a phone call between Deutsche Bank and Mr. Rowse, Deutsche Bank informed GTR that it would not move forward with the transactions, and

20

further was not comfortable doing any future GSM transactions with GTR unless GTR appeared as the Actual Exporter on the bills of lading.

71. Mr. Rowse already had copied Deutsche Bank on a communication falsely accusing GTR of involving the U.S. Export-Import Bank on cattle shipments that were being used for GSM-102 transactions.

72. In December 2013, Mr. Rowse raised issues with "discrepancies" in the documents presented by GTR and apparently created serious doubt about the documents, causing Deutsche Bank to walk away from the transactions. Even though Mr. Lillemoe had requested a meeting among FAS, GTR and Deutsche Bank, Mr. Rowse inserted himself in GTR's and Deutsche Bank's business, purposefully excluded Mr. Lillemoe from the call, and deliberately defamed him before Deutsche Bank.

73. Mr. Lillemoe and GTR are not aware of Mr. Rowse or FAS similarly scrutinizing any other participants' transactions or affirmatively raising issues with documents presented by any other GSM Exporter during the process of a bank's negotiation of a GSM-102 LC.

74. Mr. Lillemoe and GTR had a long-standing relationship with Deutsche Bank and engaged in hundreds of GSM-102 transactions and other trade finance transactions. Mr. Rowse interfered in Mr. Lillemoe's and GTR's business relationship with Deutsche Bank. Because of the reputational damage caused by Mr. Rowse's communications in December 2013, Deutsche Bank will no longer do business with Mr. Lillemoe or GTR.

75. Adding insult to injury, Mr. Rowse refused to refund the Program fees for the GSM-102 guarantees with Deutsche Bank that FAS and Mr. Rowse had sabotaged.

76. Even more problematic than Mr. Rowse's direct defamatory communications to one of Mr. Lillemoe's and GTR's business partners is the detrimental effect of Mr. Rowse's and

FAS's deliberately unequal application—to GTR only—of Mr. Rowse's decision to ban the use of rented trade flows.

77.    In order to continue to do business over the course of 2013 and 2014, Mr. Lillemoe attempted to use the "linear" structure that Mr. Rowse indicated he wanted to see under the Program.  During this time, Mr. Rowse himself admitted that Mr. Lillemoe had executed Program transactions with a "linear" structure.  When speaking to suppliers, foreign banks, brokers, exporters, importers and others involved in the Program, Mr. Lillemoe learned that FAS had not communicated that such a revised structure was required, was not scrutinizing anyone else's transactions with respect to that structure, and had not rejected any other participant for using rented trade flows.

78.    No one else, other than Mr. Lillemoe and GTR, was experiencing the same demands by FAS and Mr. Rowse.  Few of GTR's clients wanted to change their prior course of conduct at the behest of Mr. Lillemoe and GTR to work under a less efficient structure.  Indeed, those clients had no incentive to do so given that they could switch to Mr. Lillemoe's competitors. FAS and Mr. Rowse left Mr. Lillemoe's competitors alone, allowing business as usual with respect to their renting of trade flows.  The dwindling clients that agreed to work with Mr. Lillemoe using the modified structure required by Mr. Rowse, did so with skepticism.  These trading companies found it odd that GTR told a different story about the Program requirements than did all other participants.  Mr. Rowse's and FAS's purposefully uneven application of their December 28, 2012 decision to Mr. Lillemoe and GTR ruined GTR's credibility in the structured trade finance market.

22

79.    As discussed above, based on information from his business partners and friends in the trading community and efforts to obtain information from FAS through FOIA,[4] Mr. Lillemoe knows that Mr. Rowse and FAS have been aware of and have approved rented trade flow transactions for more than a decade, and have continued to approve Program applications using rented trade flows to this day.

80.    By rejecting GTR's GSM-102 applications but refusing to stop other similarly situated GSM Exporters from obtaining GSM guarantees that used rented trade flows, FAS and Mr. Rowse purposefully cast a cloud over GTR and Mr. Lillemoe.  The implication certainly was that there was something else wrong with GTR's business.  Mr. Rowse and FAS purposefully and effectively disbarred GTR and Mr. Lillemoe from the Program without having to take any formal action.

**Jonathan Doster's Tortious Violation of GTR's and Mr. Lillemoe's Equal Protection Rights.**

81.    Mr. Lillemoe learned in 2015 that FAS's disparate treatment of GTR and himself was not limited to the actions by FAS and Mr. Rowse described above.  Beginning in 2009 and continuing throughout Mr. Lillemoe's and GTR's active participation in the Program, FAS personnel, in particular Jonathan Doster, purposefully treated Mr. Lillemoe and GTR differently than other GSM Exporters, attempting to drive them out of the Program and destroy Mr. Lillemoe's business.

82.    Despite FAS's 2009 apparent determination that renting trade flows did not violate Program regulations, Jonathan Doster and other FAS employees audited one of Mr. Lillemoe's business associates, Pablo Calderon, seeking evidence of Mr. Lillemoe and Mr. Calderon renting

---

[4] In the FOIA case, *Calderon v. U.S.D.A.*, No. 14-0425 (D.D.C., filed March 18, 2014), FAS is attempting to cover its tracks.  With minor exceptions, FAS has orchestrated a cover-up by redacting portions of documents that it was forced to produce, which would otherwise reveal that the majority of participants in the Program used rented trade flows in transactions that FAS reviewed and approved.

trade flows or "buying BLs," as Mr. Doster described it, on the theory that it was "fraud"—while knowingly allowing similarly situated GSM Exporters to continue to use rented trade flows to obtain GSM-102 guarantees. Mr. Doster worked with Mr. Lillemoe's competitors to investigate his business and that of Mr. Calderon, and their use of rented trade flows, ultimately referring the matter to the USDA Office of Inspector General and the U.S. Attorney's Office for the District of Connecticut. Mr. Doster and other FAS employees had no concerns for divulging GTR's business information to competitors of GTR and Mr. Lillemoe during the course of this investigation. Mr. Doster and other FAS employees continued the investigation knowing almost all other major GSM Exporters continued engaging in similar trade flow rentals in structuring Program transactions.

83. In 2015, Mr. Lillemoe learned of multiple instances where FAS and Mr. Doster in particular purposefully applied FAS's processes and procedures unequally to GTR and Mr. Lillemoe, as compared to other GSM Exporters, disadvantaging GTR and Mr. Lillemoe and costing them millions of dollars in Program guarantees.

84. GSM Exporters have the ability to register and "squat" on foreign bank limits while they are finalizing their negotiations with the foreign bank to complete a GSM-102 transaction. When a foreign bank wanted to do business with GTR, but other GSM-102 participants, who were multinational companies like Bunge and Cargill, had made claims on the foreign bank's limits, FAS and Mr. Doster responded that nothing could be done to assist the foreign bank. The foreign bank had to negotiate with, and often beg, the other GSM-102 participants to have them remove the registrations against its own limit. On the other hand, FAS and Mr. Doster's subordinates actively reached out to foreign banks to "confirm" that they were

24

doing business with GTR.  If the foreign bank did not confirm, FAS Mr. Doster's subordinates would compel GTR to switch banks.

85.    In one particular instance involving International Industrial Bank, Russia ("IIB") in 2010, IIB explicitly requested FAS to disallow the unauthorized GSM participants to squat on their limit, in order to make room for the GTR registrations.  After multiple such requests of FAS, Mr. Doster informed IIB that he could not force the other GSM-102 participants to move their registrations to another bank, even though IIB had firmly committed to GTR and did not intend to do business with the other GSM-102 participants.  Due to Mr. Doster's refusal to act, it took IIB several weeks of pleading with the other GSM-102 participants to switch their registrations to other banks to free up its own credit limit in order to engage in the transaction with GTR. After a delay of almost two months, the CCC operations team finally and officially confirmed two IIB GSM registrations on behalf of GTR.  The next day Mr. Doster reneged on CCC's commitment and advised Mr. Lillemoe that GTR would not be allowed to proceed with those two IIB registrations.  Mr. Lillemoe had to go above Mr. Doster to obtain the guarantees.  Mr. Lillemoe confirmed in 2015 that he and GTR were being treated differently by Mr. Doster than other GSM Exporters.

86.    Similarly, Mr. Lillemoe has learned of additional occasions where Mr. Doster purposefully treated GTR differently from other GSM Exporters, in particular with respect to the application of key deadlines in the Program.

87.    On several occasions, Mr. Doster denied GTR's request for shipment date extensions, even short three-day to one-week extensions, invalidating GTR's registrations.  At the same time, Mr. Doster granted four-month extensions to other GSM Exporters—again the huge agribusiness trading companies—that were Mr. Lillemoe's and GTR's competitors.

25

88.     In one particularly egregious instance, Mr. Doster rejected over $100 million of GTR Program applications dated March 12, 2010 for poultry destined for Russia, citing Russia's ban of US poultry imports in place at the time.  Mr. Doster's reasoning was that there could not be a "firm" sale of poultry to Russia during the ban, and therefore GTR's March 12 applications would not qualify.  Meanwhile, GTR's competitor Cargill Financial Services Inc. and several of its affiliates filed applications on the same day that GTR's had been rejected, and subsequently utilized shipments of poultry to Russia under the related guarantees.  Under Mr. Doster's reasoning, Cargill should have not been allowed to utilize those poultry shipments to Russia for the March 12 registrations.

89.     When Mr. Lillemoe expressed concerns to Mr. Doster about GTR's competitors applying shipments of poultry to Russia under the March 12 registrations, Mr. Doster was adamant that FAS would not permit it, and that any such transactions would fail an FAS audit.  However, Mr. Lillemoe learned in 2015 that contrary to his statements to Mr. Lillemoe then, Mr. Doster allowed Cargill to do exactly that.  In fact, Mr. Doster granted Cargill a shipment date extension of more than four months for the March 12 guarantees to allow it to use the Russian poultry shipments once the ban was lifted, and even refunded guarantee fees to Cargill for some unused March 12 guarantee coverage, citing the reason for the refund as: "Russian restrictions on poultry exports."  Further, GSM guarantee number GSM-102-822428, successfully registered by Cargill on March 12, 2010, was audited by FAS and included a shipment of poultry to Russia.  Mr. Lillemoe is not aware of Cargill having failed that audit.

## Count I - Administrative Procedure Act
### (Defendant USDA/FAS)

90.     Paragraphs 1 through 89 are realleged and incorporated herein by reference.

91.     This Count I is brought against Defendant FAS under 5 U.S.C. §§ 702 & 706.

92.    FAS acted arbitrarily and capriciously and otherwise not in accordance with law and contrary to the Fifth Amendment by rejecting GSM-102 applications submitted by GTR because of its use of rented trade flows under the Program while approving GSM-102 applications from other participants that used the same structure.  Without any rational basis, FAS refused to apply its decision to ban the use of rented trade flows to other similarly situated GSM Exporters.

93.    In December 2012, FAS informed GTR and Mr. Lillemoe that it would not approve any future GSM-102 applications that utilized rented trade flows and purposefully misled Mr. Lillemoe and GTR that FAS would be applying the same rules to other participants in the Program.

94.    While there were no formal USDA or FAS regulations governing appeals of these decisions, Mr. Lillemoe informed FAS that GTR would not appeal because FAS made it clear to Mr. Lillemoe that it would no longer approve the use of rented trade flows.  FAS intentionally did nothing to disabuse him of this notion.

95.    Instead, FAS further deliberately misled Mr. Lillemoe and GTR in a meeting on February 20, 2013 when Mr. Rowse told Mr. Lillemoe that FAS was having the same conversations with all parties.

96.    Contrary to its representations to and its conduct with respect to GTR and Mr. Lillemoe, and without any rational explanation or basis, FAS continued to approve GSM-102 applications from other similarly situated participants that utilized rented trade flows.  Certain of the other participants executed these transactions, and continue to do so even in 2016, with some of GTR's best (former) clients.

97.     Based on information Mr. Lillemoe has received from others in the structured trade finance market in 2013, 2014, 2015 and 2016, FAS has made no effort to eradicate the use of rented trade flows or to ensure a relationship between the GSM Importer and Consignee in transactions by other participants in the Program.  FAS has continued to approve such GSM-102 applications and direct CCC to issue GSM-102 guarantees for other similarly situated participants after December 28, 2012 and as recently as March of 2016.

98.     FAS's deliberately unequal application of its GSM-102 regulations to GTR and Mr. Lillemoe, is arbitrary and capricious, contrary to law and in violation of his right to equal protection under the Fifth Amendment, and resulted in GTR and Mr. Lillemoe being unable to carry on any business under the Program.

WHEREFORE, GTR and Mr. Lillemoe respectfully request that this Court enter an order:

A.  finding that FAS acted arbitrarily and capriciously in determining that GTR and Mr. Lillemoe could not use common structured trade finance structures and practices, including renting trade flows, to apply for and obtain GSM-102 guarantees, and not applying that determination equally to other similarly situated GSM Exporters;

B.  finding that FAS acted contrary to law and the Fifth Amendment when deliberately, FAS unequally applied—to GTR and Mr. Lillemoe only—its determination under Program regulations that rented trade flows or transactions without any relationship between the GSM Importer and Consignee could not be used;

C.  requiring FAS to clarify its position with respect to the use of rented trade flows in the Program and apply that determination equally to all participants in the Program;

D.  reimbursing GTR for all Program fees that FAS previously refused to refund relating to transactions that FAS improperly disrupted or would not approve; and

E.  granting such other relief as the Court may deem just and proper.

28

## Count II - Violation Of Fifth Amendment Equal Protection Rights
### (Defendant USDA/FAS)

99.    Paragraphs 1 through 89 are realleged and incorporated herein by reference.

100.    FAS violated Mr. Lillemoe's and GTR's right to equal protection under the Fifth Amendment by rejecting GSM-102 applications submitted by GTR because of its use of rented trade flows and, without any rational basis, refusing to apply the same determination under the Program to other similarly situated GSM Exporters who used, and continue to use, the same structure.

101.    In December 2012, FAS informed GTR and Mr. Lillemoe that it would not approve any future GSM-102 applications that utilized rented trade flows and purposefully misled Mr. Lillemoe and GTR that FAS would be applying the same rules to other participants in the Program.

102.    While there were no formal USDA or FAS regulations governing appeals of these decisions, Mr. Lillemoe informed FAS that GTR would not appeal because it was clear that FAS would no longer approve the use of rented trade flows.  FAS intentionally did nothing to disabuse him of this notion.

103.    Instead, FAS further deliberately misled Mr. Lillemoe and GTR in a meeting on February 20, 2013 when Mr. Rowse told Mr. Lillemoe that FAS was having the same conversations with all parties.

104.    Contrary to its representations to and its conduct with respect to GTR and Mr. Lillemoe, and without any rational explanation or basis, FAS continued to approve GSM-102 applications from other similarly situated participants that utilized rented trade flows.  Certain of the other participants executed these transactions, and continue to do so to this day, with some of GTR's best  (former) clients.

29

105.    Based on information Mr. Lillemoe has received from others in the structured trade finance market in 2013, 2014, 2015 and 2016, FAS has made no effort to eradicate the use of rented trade flows or to ensure a relationship between the GSM Importer and Consignee in transactions by other participants in the Program.  FAS has continued to approve such GSM-102 applications and direct CCC to issue GSM-102 guarantees for other similarly situated participants after December 28, 2012 and as recently as March of 2016.

106.    FAS's unequal application of the GSM-102 regulations to GTR and Mr. Lillemoe and refusal to apply the regulations to other similarly situated GSM Exporters without any rational basis violated his right to equal protection under the Fifth Amendment and resulted in GTR and Mr. Lillemoe being unable to carry on any business under the Program.

WHEREFORE, GTR and Mr. Lillemoe respectfully request that this Court enter an order:

A. finding that FAS violated the Fifth Amendment when deliberately, FAS unequally applied—to GTR and Mr. Lillemoe only—its determination under Program regulations that rented trade flows or transactions without any relationship between the GSM Importer and Consignee could not be used;

B. requiring FAS to clarify its position with respect to the use of rented trade flows in the Program and apply that determination equally to all participants in the Program;

C. reimbursing GTR for all Program fees that FAS previously refused to refund relating to transactions that FAS improperly disrupted or would not approve; and

D. granting such other relief as the Court may deem just and proper.

### Count III - *Bivens* Claim for Tortious Violation of Fifth Amendment Right to Equal Protection (Defendant Rowse)

107.    Paragraphs 1 through 89 are realleged and incorporated herein by reference.

108.    This Count III is brought against Defendant Phillip Mark Rowse individually for his unequal and tortious treatment of GTR and Mr. Lillemoe under the Fifth Amendment.

30

109.    Mr. Rowse has been at the center of FAS's unlawful and unconstitutional treatment of GTR and Mr. Lillemoe.  As the Director of the Credit Programs Division at FAS, Mr. Rowse oversaw the Program and approved or denied GSM-102 guarantees.  Mr. Rowse oversaw and was responsible for employees who worked under him, including Jonathan Doster and Amy Slusher.

110.    Mr. Lillemoe has met and communicated with Mr. Rowse about the Program and the use of structures that included rented trade flows over the course of several years.  Mr. Rowse has been aware since at least May 12, 2009 that GTR employed such structures in its GSM-102 transactions.

111.    Mr. Rowse has been aware of the use of such structures, including rented trade flows, by other participants in the Program for many years.

112.    Mr. Rowse has approved GSM-102 applications and compelled CCC to issue GSM-102 guarantees in support of transactions that utilize rented trade flows and he continues to do so to this day.

113.    In October 2012, Mr. Rowse initiated an investigation into the trade flow rental structure of several of GTR's GSM-102 transactions that FAS had already approved.

114.    In doing so, Mr. Rowse also falsely accused GTR and Mr. Lillemoe of wrongdoing by using exports in the Program that had purportedly been used in a U.S. Export-Import Bank program.  Mr. Rowse maliciously and without any legitimate purpose copied Deutsche Bank on that communication with the intent to defame GTR and Mr. Lillemoe and tortiously interfere in their business.  In January 2013, when Mr. Lillemoe asked Mr. Rowse about his earlier allegations regarding the U.S. Export-Import Bank, Mr. Rowse admitted: "we

really didn't have anything there."  Mr. Rowse has not made similar communications to or otherwise interfered with other GSM Exporters' banks.

115.    Mr. Rowse's investigation confirmed what he already knew—that GTR's transactions employed rented trade flows under the very same transaction structure previously vetted with Mr. Rowse and a USDA attorney.

116.    On December 28, 2012, after his investigation, Mr. Rowse denied fifteen pending applications that had been submitted by GTR and Mr. Lillemoe.  Mr. Rowse purportedly denied them because GTR rented trade flows from the Actual Exporter on the BL, *i.e.* there was no shipment to the GSM Importer and the GSM Importer had no relationship with the Consignee.

117.    Mr. Rowse further informed GTR and Mr. Lillemoe that any future applications from GTR utilizing rented trade flows in this manner would be denied.

118.    Mr. Lillemoe understood this to be a change in the way that Mr. Rowse would administer the entire Program.  Indeed, as he expressly informed Mr. Rowse in January 2013, Mr. Lillemoe did not appeal the decision because "[i]t is clear to us that the USDA no longer approves of the structure utilized in these applications."

119.    Mr. Rowse intentionally did nothing to disabuse Mr. Lillemoe of his reasonable conclusion that the prohibition of the rented trade flows was a global change to how Mr. Rowse would implement the Program on a going forward basis (when in fact it was not).

120.    Instead, Mr. Rowse purposefully continued to mislead Mr. Lillemoe and GTR during a February 20, 2013 meeting and up through an April 1, 2014 meeting in Washington, D.C. including Messrs. Lillemoe and Rowse and Ms. Slusher.

121.    On February 20, 2013, Mr. Lillemoe confronted Mr. Rowse with knowledge that, contemporaneous with its denial of GTR's applications, Mr. Rowse had approved GSM-102

applications and CCC had issued GSM-102 guarantees to other similarly situated GSM Exporters who utilized rented trade flows. In response, Mr. Rowse stated, "we are having the same conversations with all parties."

122. During a meeting on April 1, 2014, in response to the same question about the unequal application of the December 28, 2012 decision, Mr. Rowse stated: "Where we see concerns, we look into it."

123. Based on Mr. Lillemoe's communications with other GSM Exporters, Mr. Rowse did not have those same conversations with all parties or "look into" other GSM Exporters' transactions for "concerns" relating to rented trade flows. Instead, he continued to approve Program guarantees submitted by other similarly situated GSM Exporters that used rented trade flows.

124. Not content with merely preventing Mr. Lillemoe and GTR from engaging in transactions using the disallowed structure, Mr. Rowse purposefully interfered with transactions that were compliant with Program regulations by either delaying FAS's confirmation of the guarantees or actively sabotaging Mr. Lillemoe's and GTR's business relationships. These transactions could not be questioned under his December 28, 2012 determination because they followed the structure Mr. Rowse informed Mr. Lillemoe he wanted to see in Program transactions. Mr. Rowse did not engage in such conduct with respect to other GSM Exporters, even those that continued to use rented trade flows.

125. Mr. Rowse continued to defame and harm GTR and Mr. Lillemoe in December 2013 by purposefully raising issues with Deutsche Bank about documents presented by GTR for negotiation and implying, if not expressly stating, that FAS may not back the guarantees assigned by GTR in the event of a future claim by Deutsche Bank.

126.    Based on Mr. Rowse's unlawful and unnecessary communications with Deutsche Bank, Mr. Lillemoe and GTR lost a 13-year relationship.  Deutsche Bank ceased doing business with Mr. Lillemoe or GTR in the Program or in other trade finance transactions.  Mr. Rowse did not interfere with the banking relationships of other similarly situated GSM Exporters.

127.    Further, Mr. Rowse's deliberate, singular denial of the use of rented trade flows by GTR and Mr. Lillemoe destroyed Mr. Lillemoe's reputation in the market.  His clients and other participants no longer viewed him as credible when, contrary to Mr. Rowse's claims, Mr. Rowse and FAS continued to allow GTR's and Mr. Lillemoe's competitors, other similarly situated GSM Exporters, to engage in transactions involving the purportedly disallowed structures.

128.    Mr. Rowse's purposefully unequal and targeted treatment of GTR and Mr. Lillemoe destroyed his business.  Mr. Rowse never provided Mr. Lillemoe or GTR with a rational basis for this unequal treatment, instead misleading them that he was applying FAS's regulations equally when he was not.

129.    GTR and Mr. Lillemoe cannot be made whole through an administrative proceeding or direct claim against FAS given the loss of income and business and damage to reputation that has occurred because of Mr. Rowse's intentional and unconstitutional tortious conduct.

WHEREFORE, GTR and Mr. Lillemoe respectfully request that this Court enter an order:

A.  finding that Mr. Rowse tortiously violated GTR's and Mr. Lillemoe's right to Equal Protection under the Fifth Amendment;

B.  awarding damages for GTR's loss of income and business and Mr. Lillemoe's loss of livelihood and reputation;

C.  granting such other relief as the Court may deem just and proper.

**Count IV - *Bivens* Claim for Tortious Violation of Fifth Amendment
Right to Equal Protection (Defendant Doster)**

130.    Paragraphs 1 through 89 are realleged and incorporated herein by reference.

131.    This Count IV is brought against Defendant Doster individually for his unequal and tortious treatment of GTR and Mr. Lillemoe in violation of their right to Equal Protection under the Fifth Amendment.

132.    Mr. Lillemoe has likely only discovered the tip of the iceberg with respect to Mr. Doster's conduct, but what he has learned in 2015 demonstrates that Mr. Doster also has been at the center of FAS's illegal action against him and GTR.  Mr. Doster spearheaded an investigation against Mr. Lillemoe and his business partners centered around the rental of trade flows, while condoning continued use of the same structure by competitors of Mr. Lillemoe and GTR.  Mr. Doster engaged in a pattern of unconstitutional action by purposefully applying FAS's rules and policies unequally in order to interfere with GTR's and Mr. Lillemoe's business and livelihood.

133.    Mr. Doster purposefully enforced Program deadlines unequally and without any rational basis against GTR and Mr. Lillemoe as compared to other similarly situated GSM Exporters.  In one instance, Mr. Doster effectively gave one of GTR's competitors a four-month extension for a shipment date, while rejecting out-of-hand a shorter request from Mr. Lillemoe. In this case, Mr. Doster also purposefully applied unequally the Program's registration requirements by allowing the competitor to register for transactions and apply shipments in a country that was at the time banned under the Program.

134.    In doing so, Mr. Doster purposefully rejected, cancelled or made sure that GTR and Mr. Lillemoe could not receive the benefit of millions of dollars in guarantees under the Program.  At the same time, Mr. Doster gave extensions to GTR's similarly situated competitors under the same circumstances allowing them to obtain GSM-102 registrations when GTR could

35

not.  This not only cost GTR and Mr. Lillemoe millions of dollars in lost revenue but damaged GTR's and Mr. Lillemoe's reputation in the Program because these roadblocks reduced their credibility and made them less successful in servicing their customers.

135.    Mr. Doster also intentionally disclosed information about GTR's business in the Eurasia 2009 program with at least one of GTR's direct competitors over the course of two or more years, a clear breach of FAS's policies and contrary to FAS's application of confidentiality rules in other instances involving similar information of other GSM Exporters.

136.    Mr. Doster also repeatedly divulged business information about Mr. Lillemoe's and GTR's Program transactions under FOIA requests directed at FAS, without contacting Mr. Lillemoe or GTR or allowing them to object to disclosure of any such information.  By doing this, Mr. Doster applied his treatment of FOIA requests received by FAS unequally and to the detriment of GTR.

WHEREFORE, GTR and Mr. Lillemoe respectfully request that this Court enter an order:

A.  finding that Mr. Doster tortiously violated GTR's and Mr. Lillemoe's right to Equal Protection under the Fifth Amendment;

B.  awarding damages for GTR's loss of income and Mr. Lillemoe's loss of livelihood and reputation; and

C.  granting such other relief as the Court may deem just and proper.

Dated:  July 29, 2016

Respectfully submitted,


/s/ *Steven M. Chasin*

Steven M. Chasin  (DC Bar# 495853)
**Baker & McKenzie LLP**
815 Connecticut Ave., N.W.
Washington, DC 20006
Tel: +1 202 835 6132
Fax: +1 202 416 7132
steven.chasin@bakermckenzie.com

Douglas B. Sanders (DC Bar# IL0029)
**Baker & McKenzie LLP**
300 E. Randolph Street
Chicago, IL 60601
Tel: (312) 861-8075
Fax: (312) 698 2375
douglas.sanders@bakermckenzie.com