# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRETT LILLEMOE, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, FOREIGN
AGRICULTURAL SERVICE, *et al.*,

        *Defendants.*

Civil Action No. 15-cv-2047 (DLF)

## MEMORANDUM OPINION

The Foreign Agricultural Service (FAS) administers a federal program designed to finance U.S. agricultural exports. Plaintiffs Brett Lillemoe and GTR, LLC bring this suit against FAS under the Administrative Procedure Act (APA) and the equal protection component of the Fifth Amendment, asserting that FAS intentionally applied program regulations and policies to them unequally for no adequate reason. The plaintiffs also bring *Bivens* claims against two individual FAS employees, Phillip Rowse and Jonathan Doster, asserting that they personally treated the plaintiffs differently from other program participants without a rational basis. Before the Court is the defendants' Motion to Dismiss Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 30. For the reasons that follow, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND[1]

### A. The Program and "Rented Trade Flow" Transactions at Issue

FAS—a component of the United States Department of Agriculture (USDA)—administers the Export Guarantee Program (GSM-102) on behalf of the Commodity Credit Corporation (CCC). First Am. Compl. ¶¶ 4, 7, Dkt. 25; *see also* 7 U.S.C. § 5622; 7 C.F.R. § 1493, *et seq.*[2] The stated purpose of the program is to finance the commercial export of U.S. agricultural products, particularly to developing countries. First Am. Compl. ¶ 8. Rather than finance exports directly, however, the program guarantees private loans extended by U.S. banks to foreign banks in connection with qualifying agricultural shipments. *Id.* ¶ 9.

In what FAS considers a "typical" program transaction, a registered U.S. exporter first negotiates an export sale with an importer in a qualifying region and then applies to FAS for a GSM-102 guarantee based on the sale. *Id.* ¶ 13 (citing then-current regulations attached to the plaintiffs' complaint as Exhibit A). FAS in turn approves, modifies, or rejects the application. *Id.* ¶ 15. If the application is approved, a foreign bank issues a letter of credit (LC) in favor of the U.S. exporter, *id.* ¶ 16, and then refinances its obligation under the LC with a loan from a U.S. bank, *id.* ¶ 17. That loan—from the U.S. bank to the foreign bank—is what the program guarantees. *Id.* Thus, if the foreign bank fails to meet its payment obligations under the loan, the U.S. bank can submit a notice of default to CCC and recover a portion of its losses. *Id.* Thanks

---

[1] The facts here are recited as alleged in the plaintiffs' First Amended Complaint and are assumed true, as they must be in considering a motion to dismiss. *See Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 8 (D.D.C. 2018).

[2] Other courts have previously summarized the GSM-102 program and the structure of the financial transactions at issue here. *See, e.g.*, *Calderon v. U.S. Dep't of Agric.*, 236 F. Supp. 3d 96, 102–04 (D.D.C. 2017), *appeal dismissed sub nom. Calderon v. U.S. Dep't of Agric., Foreign Agric. Serv.*, No. 17-5088, 2017 WL 4231169 (D.C. Cir. May 31, 2017); *United States v. Lillemoe*, 242 F. Supp. 3d 109, 112–13 (D. Conn. 2017).

to this guarantee, the U.S. bank can offer below-market interest rates to foreign banks interested in financing agricultural exports, thereby fulfilling the program's stated purpose of facilitating exports to qualifying countries.

But, according to the plaintiffs, the vast majority of GSM-102 transactions do not follow the "typical" structure. Instead, two separate and distinct transactions occur: first, a physical sale of goods between a shipper (or "Actual Exporter") and foreign importer (or "Consignee"), and second, a purely financial or paper "sale" between a "GSM Exporter" and "GSM Importer." Pls.' Opp'n at 4, Dkt. 33 (citing First Am. Compl. ¶ 21). The GSM Exporter and GSM Importer are the entities identified in the guarantee application submitted to FAS, but they play no role in the actual export of physical goods. *Id.* (citing First Am. Compl. ¶ 19). Rather, to qualify for the guarantee, they use photocopies of shipping documents obtained through a practice called "renting trade flows." *Id.* (citing First Am. Compl. ¶ 19). In a rented trade flow transaction, the GSM Exporter acquires the right to use bills of lading (BLs) and other shipping documents from an Actual Exporter for a fee. *Id.* This "rental" is accomplished through a simultaneous and offsetting sale and repurchase by which the underlying goods are sold from the Actual Exporter to the GSM Exporter, from the GSM Exporter to the GSM Importer (who are often "related companies"), and from the GSM Exporter back to the Actual Exporter, without the goods ever physically changing hands. First Am. Compl. ¶¶ 21, 23; *see also id.* Ex. B., Dkt. 25-2 (diagram representing rented trade flow transaction). Afterward, the GSM Exporter uses the paper trail from these transfers to obtain a GSM-102 guarantee based on the "sale" between the GSM Exporter and the GSM Importer. Pls.' Opp'n at 4 (citing First Am. Compl. ¶ 21). The GSM Importer then applies to a foreign bank for a "synthetic LC" that does not actually finance the purchase of physical goods. First Am. Compl. ¶ 19–21; *see also id.* Ex. B. Although a physical

shipment of goods must still ultimately underlie each rented trade flow transaction, the entities

benefited by the GMS-102 guarantee have nothing to do with that shipment other than "renting"

the right to use the shipping documents after the fact. *Id.* at 3–5 (citing First Am. Compl. ¶¶ 18,

24). Through rented trade flows, U.S. banks can issue program-guaranteed—and thus below-

market—loans to foreign banks for purposes unrelated to the actual purchase of agricultural

exports. *Id.* at 3–4 (citing First Am. Compl. ¶¶ 18–20). And the GSM Exporter and GSM

Importer receive a fee from the foreign bank for "facilitating the foreign bank's access to

unrestricted, low interest rate funds." First Am. Compl. ¶ 21.

### B. FAS's Knowledge of and Response to Rented Trade Flow Transactions

FAS discovered the widespread use of rented trade flows under the program early on.

Cargill Incorporated, a program participant, disclosed the structure and use of rented trade flows

to FAS as early as 2002, and FAS neither objected nor gave any indication that rented trade

flows were not allowed. *Id* ¶ 25. Thereafter, FAS vetted and approved thousands of rented

trade flow transactions over the course of thirteen years. *Id.*

During that time, GTR repeatedly disclosed its own use of synthetic LCs and rented trade

flows to FAS. *Id.* ¶ 26. On May 12, 2009, Brett Lillemoe, on behalf of GTR, met with Mark

Rowse, the Director of FAS's Credit Program Division, and Peter Bonner, a USDA attorney, to

explain the structure of rented trade flow transactions in detail. *Id.* ¶ 27. In the meeting,

Lillemoe provided Rowse and Bonner with a detailed diagram of a proposed rented trade flow

transaction, which "clearly illustrate[d]" that the Actual Exporter and Consignee "were not

directly involved in the GSM-102 transaction" and that "the GSM transaction would result in the

foreign bank obtaining a loan from the US bank at below-market interest rates due to the GSM

guarantee." *Id.* ¶¶ 28–29; *see also id.* Ex. B. Further, Lillemoe explained that "nearly all, if not

all," program transactions concerning Russia and Eurasia used the rented trade flow structure presented in the meeting. *Id.* ¶ 29.

After the meeting, FAS "fully vetted" the use of rented trade flows internally. *Id.* ¶ 30. FAS's legal counsel stated in internal communications that rented trade flows did not violate program regulations. *Id.* And FAS approved multiple GTR guarantees identical to those described in the May 2009 meeting without communicating any concerns to Lillemoe. *Id.* In addition, FAS paid out claims on defaulted program transactions that used rented trade flows in 2002, 2004, 2008, 2009, and 2010. *Id.* ¶ 32. And the structure of those transactions would have been abundantly clear to FAS when it investigated the claims. *Id.* ¶ 33. FAS was also made aware of the rampant use of rented trade flows when it solicited industry comments regarding the program in 2008. *Id.* ¶¶ 35–37. Cargill—a major program participant—submitted comments in which it explained the prevalence of rented trade flow transactions, complained about the impact of rented trade flows on pricing, admitted to using rented trade flows itself in certain markets, and warned that the widespread use of rented trade flows might not withstand congressional scrutiny given the purpose of the program. *Id.*

## C. FAS's and Rowse's Treatment of Lillemoe and GTR Under the Program

Lillemoe participated in the program, through GTR and various other entities, for over fifteen years, and GTR became a registered exporter in 2007. *Id.* ¶ 39. FAS eventually suspended Lillemoe—or GTR, or both (the complaint does not specify)—from the program in May 2015 following Lillemoe's criminal indictment in February 2015. *Id.* ¶ 39. But before then, from 1999 to 2012, FAS approved over 500 applications by GTR and affiliated entities, and all of those applications relied on rented trade flows. *Id.* ¶ 41. GTR and its affiliates were subject to multiple compliance reviews during this period and never received a complaint. *Id.* ¶ 43.

On October 31, 2012, the plaintiffs' relationship with FAS changed when Rowse contacted Lillemoe to request additional information regarding the transaction structures underlying fifteen of GTR's then-recent and pending program applications. *Id.* ¶¶ 45–46. Rowse expressed concern with the fact that the Consignee listed on the bills of lading differed from the importer identified on the GSM-102 guarantee, and he requested additional information about the role each entity played in the transaction. *Id.* ¶ 45. This request "surprised" Lillemoe because he had just spoken with another GSM exporter who submitted similar applications on the same day, but had not faced similar scrutiny. *Id.* ¶ 47. Rowse approved the other exporter's applications within two weeks, without inquiry or delay. *Id.*

Lillemoe responded to Rowse's inquiry, explaining that the transactions mirrored those discussed with Rowse and the USDA attorney back in 2009 and that a majority of program participants used the same structure. *Id.* ¶ 48. Still, Rowse denied the applications on the ground that the GSM Importer listed on the application had no relationship with the Consignee specified on the bills of lading. *Id.* ¶¶ 49–50. And he made clear that "any future applications utilizing the same structure will also be denied." *Id.* ¶ 50 (quoting *id.* Ex. G., Dkt. 25-7). Lillemoe and GTR declined to appeal Rowse's decision because they concluded that FAS simply no longer approved of the rented trade flow structure reflected in the applications. *Id.* ¶ 51.

Based on the position articulated by Rowse, Lillemoe withdrew three pending applications in January 2013 that used rented trade flows, and he requested a refund of application fees totaling $122,719.50. *Id.* ¶ 53. FAS refused to refund the fees. *Id.*

Lillemoe later learned that FAS had continued to approve applications using rented trade flows from other participants, without inquiry or delay. *Id.* ¶ 59. On February 20, 2013, Rowse met with Lillemoe and reiterated FAS's position that GTR's use of rented trade flows was

impermissible under program regulations. *Id.* ¶¶ 59–60. Rowse relayed FAS's concern that "two or more parties might each apply for a GSM-102 guarantee based on the same shipment or BL," and he explained that only "linear" transactions, in which the GSM Importer has a direct link to the Consignee, would be approved. *Id.* ¶ 60. When Lillemoe told Rowse that he had heard from other participants that FAS was still approving applications that did not comply with that structure—including applications from competitors Bunge and Cargill—Rowse responded that FAS was "having the same conversations with all parties." *Id.* ¶ 61.

Over the next few months, Lillemoe realized that FAS and Rowse "purposefully had misled him" and continued to approve applications based on rented trade flows with no relationship between the GSM Importer and the Consignee. *Id.* ¶ 63. In fact, Lillemoe discovered that a new entity, Grove Services, LLC, had executed a program transaction for one of GTR's former customers using not only the exact structure proposed by GTR and rejected by Rowse but also using GTR's forms and changing only the letterhead. *Id.* ¶ 64. To confirm that Grove Services' approval was not a mistake, Lillemoe's business partner wrote Rowse on July 20, 2013 to tell him what happened, but never received a response. *Id.* ¶ 65. FAS continued to approve rented trade flow transactions involving other applicants throughout 2013, 2014, 2015, and continuing into 2016. *Id.* ¶ 67. No other applicant was ever subject to the restrictions on rented trade flows that Rowse and FAS imposed on Lillemoe and GTR. *Id.* ¶ 78.

In addition to prohibiting Lillemoe and GTR from using rented trade flows, FAS also made it difficult for them to participate in the program using the "linear" structure Rowse required. In January 2013, GTR had applied for three South America guarantees using a linear structure. *Id.* ¶ 56. FAS would normally confirm such guarantees within one week or less. *Id.* But in this case, FAS delayed for over two weeks, causing GTR's customer, Bancocolombia, to

grow concerned that FAS would not approve the transactions at all. *Id.* ¶¶ 56–57. GTR tried to

reassure Bancocolumbia and persuade Rowse to act quickly on the applications, but he did not

succeed. *Id.* ¶ 57. Rowse eventually approved the applications on January 10, but by that time

Bancocolumbia had executed the transactions with one of GTR's competitors. *Id.* ¶¶ 57, 58.

In another instance, Lillemoe had several Russian transactions pending with Deutsche

Bank that also conformed with the "linear" structure FAS purportedly required. *Id.* ¶ 70.

Without consulting Lillemoe, Rowse informed Deutsche Bank of potential "discrepancies" in

GTR's documents, casting doubt on their authenticity and causing Deutsche Bank to abandon the

transactions and terminate its business relationship with Lillemoe and GTR. *Id.* ¶¶ 72, 74.

Afterward, Rowse refused to refund the fees paid in connection with these "sabotaged" Deutsche

Bank guarantees. *Id.* ¶ 75.

### D. Doster's Treatment of Lillemoe and GTR Under the Program

In 2015, Lillemoe learned that another individual FAS employee, Jonathan Doster, had

also treated GTR and Lillemoe differently from other participants. *Id.* ¶ 81. Although FAS had

determined that rented trade flow transactions did not violate program regulations in 2009,

Doster audited Lillemoe's business associate, Pablo Calderon, in search of evidence that

Lillemoe and Calderon had rented trade flows, which Doster considered "fraud" despite the fact

that nearly all major GSM Exporters used the same structure. *Id.* ¶ 82. Doster investigated

Lillemoe's business and ultimately referred the matter to the USDA Office of Inspector General

and the U.S. Attorney's Office in the District of Connecticut. *Id.*

Doster also made it more difficult for Lillemoe and GTR than for other participants to

address the issue of U.S. banks "squatting" on foreign bank limits. *Id.* ¶ 84. Squatting allows

U.S. banks to register—and tie up—foreign bank limits during program negotiations, even when

the foreign bank would prefer to commit its funds to program transactions with other entities. *Id.*

Doster made it nearly impossible for GTR and Lillemoe—and only them—to remove unwanted registrations that interfered with their ability to transact with foreign banks. *Id.* ¶¶ 84–85.

Doster also routinely denied short deadline extensions requested by GTR, while granting much longer extensions requested by its competitors. *Id.* ¶¶ 86–88. In one case, Doster rejected more than $100 million worth of program applications from GTR for poultry bound for Russia on the grounds that Russia banned U.S. poultry imports at the time. *Id.* ¶ 88. GTR's competitor, Cargill, filed similar applications on the same day as GTR, yet Doster granted Cargill (but not GTR) a four-month extension so that it could use poultry shipments to Russia under the guarantee after the ban was lifted. *Id.* ¶¶ 88–89.

### E. Lillemoe's Criminal Indictment and Conviction

On February 20, 2015, a grand jury in the District of Connecticut returned a twenty-three count indictment against Lillemoe, charging him with one count of conspiracy to commit wire fraud and bank fraud, nineteen counts of wire fraud, one count of bank fraud, and one count of money laundering. *Lillemoe*, 242 F. Supp. 3d at 112. All but one of those counts centered on his and his co-defendants' participation in the GSM-102 program. *Id.* Lillemoe's criminal trial did not address the legality of rented trade flow transactions; it focused only on allegations that Lillemoe and his associate Calderon "created multiple entities to maximize their share of the limited number of GSM-102 guarantees" and "altered bills of lading" submitted to U.S. banks. *Id.* at 113–14. On November 9, 2016, a jury found Lillemoe guilty of one count of conspiracy and five counts of wire fraud. *Id.* at 114. On March 16, 2017, the district court denied Lillemoe's motion for judgment of acquittal or a new trial. *Id.* at 125.

Between Lillemoe's indictment and conviction, on November 23, 2015, Lillemoe and GTR commenced this civil suit against FAS, Rowse, and Doster. Compl., Dkt. 1.[3] The plaintiffs bring count I against FAS, claiming it acted arbitrarily and capriciously by unevenly and selectively applying a ban on rented trade flows to GTR and Lillemoe without adequate explanation. The plaintiffs also bring count II against FAS, claiming it violated the equal protection component of the Fifth Amendment by preventing them—and only them—from using rented trade flow transactions in the program without a rational basis. Finally, the plaintiffs bring count III against Rowse and count IV against Doster under *Bivens* for their individual involvement in denying the plaintiffs their right to equal protection under the Fifth Amendment. Before the Court is the defendants' joint motion to dismiss under Rule 12(b)(6).

## II. LEGAL STANDARD

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In analyzing a 12(b)(6) motion, the Court will construe the complaint liberally in favor of the plaintiff and will grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged," but the Court need not accept legal conclusions or inferences unsupported by the facts alleged. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Ctr. for Responsible Sci.*, 311 F.Supp.3d at 8. The Court will grant a motion to dismiss only where a plaintiff's "well-pleaded factual allegations," even if true, do not "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

---

[3] This case was reassigned to the undersigned on December 6, 2017.

In evaluating a motion to dismiss under Rule 12(b)(6), a court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). As relevant here, a court may consider published judicial opinions and facts on the public record, such as criminal convictions. *See, e.g.*, *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005); *U.S. ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*, 843 F. Supp. 2d 20, 28 (D.D.C. 2012).

## III. ANALYSIS

### A. Relief Sought

The plaintiffs seek an injunction requiring FAS to (1) clarify its position regarding rented trade flows, and then (2) apply that determination to all program participants. First Am. Compl. at 28, 30. The defendants raise two potential jurisdictional hurdles to the relief requested: mootness and sovereign immunity.[4] Specifically, the defendants argue that the plaintiffs' request for injunctive relief was mooted by FAS's 2014 regulations and that their request for reimbursement amounts to a claim for money damages unauthorized by the APA.[5] The Court disagrees.

---

[4] The defendants raise these jurisdictional issues solely with respect to the plaintiffs' APA claims, *see* Defs.' Mot. at 10–14, Dkt. 31-1 (corrected copy); Defs.' Reply at 9–12, Dkt. 39, but the principles of mootness and sovereign immunity are constitutional and apply equally to the plaintiffs' Fifth Amendment claims. Thus, any jurisdictional bars to the relief requested under the APA also extend to the relief requested under the Fifth Amendment. *Compare* First Am. Compl. at 28 (requesting injunctive relief and reimbursement under the APA), *with id.* at 30 (same under the Fifth Amendment).

[5] Although the defendants do not cast this latter argument in terms of sovereign immunity, the same provision that limits the relief authorized under the APA also limits the scope of the APA's waiver of sovereign immunity to claims for "relief other than money damages." 5 U.S.C. § 702; *Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985).

1.  Injunctive Relief

A claim becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 3–4 (D.C. Cir. 2008)). This can occur when "the court can provide no effective remedy because a party has already obtained all the relief that it has sought." *Mittleman v. Postal Regulatory Com'n*, 757 F.3d 300, 303 (D.C. Cir. 2014) (internal quotation marks omitted).

The plaintiffs' first request for injunctive relief—requiring FAS to clarify its position regarding rented trade flows—is moot because FAS has already clarified its position, by promulgating regulations in 2014 that explicitly prohibit the use of rented trade flows in program transactions. *See* 78 Fed. Reg. 79256 (Dec. 27, 2013) (effective Dec. 18, 2014); *see also* 7 C.F.R. §§ 1493.20, 1493.70(a), 1493.100(f)(6), 1493.130(a)(11), 1493.140(e). Thus, the plaintiffs' first request cannot be entertained by this Court. *See Mittleman*, 757 F.3d at 303 (dismissing challenge to post office closure where Postal Service had subsequently decided to keep the office open).

But the plaintiffs' second request—requiring FAS to apply its 2014 rented trade flow determination equally to all program participants—remains ripe. Although the 2014 Rule prohibiting the use of rented trade flows applies equally to all participants, *see* 78 Fed. Reg. 79256, the plaintiffs allege that FAS has continued to approve applications by other GSM Exporters utilizing rented trade flows even after the 2014 Rule became effective, *see* First Am. Compl. ¶¶ 67, 79, 96–97. Meanwhile, the plaintiffs have allegedly been subject to the same prohibition on rented trade flows announced and reiterated by Rowse. *See id.* ¶¶ 93–94. Despite

the facial equality of FAS's clarified position, the plaintiffs allege ongoing disparate treatment under the new rule, and their request for equal application of GTR's position remains ripe.

In sum, the Court will not consider the plaintiffs' request that FAS be ordered to clarify its position, but it will entertain their request that FAS be ordered to apply its newly clarified position equally to similarly situated applicants.

## 2. Reimbursement of Program Fees

"[T]he scope of the Administrative [P]rocedure Act's waiver of sovereign immunity . . . is limited to actions 'seeking relief other than money damages.'" *Md. Dep't of Human Res.*, 763 F.2d at 1446 (quoting 5 U.S.C. § 702). However, not every claim that "require[s] the payment of money by the federal government" is a claim for "money damages." *Id.* Thus, courts distinguish "between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for . . . the recovery of specific property or monies." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (emphasis and internal quotation marks omitted).

The plaintiffs do not allege that FAS was required by statute to reimburse their application fees. Rather, they seek restitution of those fees based on a theory of unjust enrichment. *See* Pls.' Opp'n at 3, 26–28. They argue that because FAS wrongfully and arbitrarily sabotaged the plaintiffs' pending applications, it was able to retain the benefit of their application fees without incurring the corresponding burden of guaranteeing actual transactions and assuming the risk of default. *Id.* at 28; *see also* First Am. Compl. ¶¶ 14, 56–58, 75. Because the plaintiffs do not seek compensation for losses resulting from FAS's actions—for instance, lost profits or damaged business relationships—but only the return of specific fees paid under

circumstances that would make it unjust for FAS to retain them, the Court concludes that the plaintiffs' request for reimbursement of application fees amounts to a request for "specific relief" within the APA's waiver of sovereign immunity. The Court may therefore entertain that request.

### B. The Plaintiffs' APA Claim Against FAS

In challenging FAS's actions on the merits, the plaintiffs first invoke the Administrative Procedure Act's requirement that a court "hold unlawful and set aside" any agency action that is "arbitrary [and] capricious." 5 U.S.C. § 706(2).[6] In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained."). An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. An agency action is also arbitrary and capricious "if the agency offers insufficient reasons for treating similar situations differently." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (internal quotation marks omitted). The party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

---

[6] The plaintiffs also argue that FAS's actions violated the Fifth Amendment and were thus "not in accordance with the law," 5 U.S.C. § 706(2)(A), but that argument fails for the reasons stated in the section of this Opinion disposing of the plaintiffs' standalone equal protection claim. *See infra* III.C.

The defendants do not challenge FAS's decision to deny applications using rented trade flows as a general matter. Pls.' Opp'n at 24. They challenge only FAS's decision to selectively prohibit the plaintiffs from using rented trade flows while simultaneously approving applications from other participants using the same structure. *Id*; *see also* First Am. Compl. ¶ 92. Taking the plaintiffs' allegations as true, as the Court must, FAS did not provide *any* reason for treating the plaintiffs differently from other applicants with respect to rented trade flow transactions; instead, FAS (through Rowse) simply denied that any disparate treatment had occurred. According to the plaintiffs, FAS deliberately "misled" GTR and Lillemoe into believing the ban on rented trade flows applied equally to all program participants, First Am. Compl. ¶¶ 54, 63, 93, 95, and Rowse assured them that FAS was "having the same conversations [about rented trade flows] with all parties," *id.* ¶¶ 61, 95. The plaintiffs allege that this explanation was a lie and that, in fact, FAS continued to approve applications utilizing rented trade flows from other participants—including Bunge, Cargill, and Grove Services—in 2012 and continuing through 2016. *Id.* ¶¶ 47, 54, 61, 64, 66–67, 96–97. Because FAS offered "insufficient reasons"—indeed, *no* reason—"for treating similar situations differently," *Muwekma Ohlone Tribe*, 708 F.3d at 216, the plaintiffs have stated a claim under the APA, and count I may proceed.

### C. The Plaintiffs' "Class of One" Equal Protection Claim Against FAS

The plaintiffs next claim that FAS violated their right to equal protection under the Fifth Amendment by treating them differently from similarly situated applicants without a rational basis. *Id.* ¶ 100.

Although equal protection claims ordinarily involve membership in a protected class, the Supreme Court has "recognized successful equal protection claims brought by a 'class of one.'"

*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).[7]  There are "two essential elements" to a successful "'class of one' equal protection claim: (1) disparate treatment of similarly situated parties (2) on no rational basis."  *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003).

The first element—the existence of similarly situated but differently treated parties—"is not a mere formality."  *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013).  "Rather, it serves to distinguish claims to the treatment that was afforded others, which can be cognizable under principles of equal protection, from bare complaints of governmental unfairness, which cannot."  *Id.*  Thus, "[c]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  *Id.* (internal quotation marks omitted).  But "whether an individual is similarly situated to comparators . . . is generally a question of fact for the jury," and "a final determination of this issue is inappropriate at the motion-to-dismiss stage."  *Galicki v. New Jersey*, No. 14-169, 2016 WL 4950995, at *15 (D.N.J. Sept. 15, 2016) (internal quotation marks omitted).

Here, the plaintiffs have alleged that they and other importers—including Cargill, Bunge, and Grove Services—are similarly situated because they all submitted applications for GSM-102 guarantees based on rented trade flow transactions with a non-linear structure.  *See* First Am. Compl. ¶ 25 ("FAS has vetted and approved thousands of such [rented trade flow] transactions over the past 13 years"); *id.* ¶ 34 (Cargill acknowledged its use of rented trade flows in the

---

[7] Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has found equal protection principles embodied in the Due Process Clause of the Fifth Amendment.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  "Equal protection analysis is substantially identical under the Fifth Amendment and the Fourteenth."  *Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998), *reh'g granted on other grounds*, 173 F.3d 898 (D.C. Cir. 1999).

program); *id.* ¶ 61 (Bunge regularly used rented trade flows in the program), *id.* ¶ 64 (Grove Services used GTR's own forms to obtain guarantee for former GTR client based on rented trade flow transaction identical to one previously submitted by GTR and denied by FAS), *id.* ¶ 80 (FAS failed to stop "similarly situated GSM Exporters" from using rented trade flows in the program), *id.* ¶ 100 (FAS refused to apply its purported ban on rented trade flows to "similarly situated GSM Exporters who used, and continue to use, the same [rented trade flow] structure" as the plaintiffs), *id.* ¶ 104 (describing "similarly situated participants that utilized rented trade flows . . . with some of GTR's best (former) clients"). Because the disparate treatment alleged is that FAS prevented the plaintiffs—and no one else—from obtaining program guarantees based on rented trade flows, the critical similarity is that the plaintiffs and their comparators both sought guarantees using the same rented trade flow structure. *See Log Creek, L.L.C. v. Kessler*, 717 F. Supp. 2d 1239 (N.D. Fl. 2010) ("[A] plaintiff and a comparator need not share every characteristic to be similarly situated; they need only be alike in relevant respects." (internal quotation marks omitted)). At this stage, the Court must accept at face value the plaintiffs' allegations that the rented trade flow transactions approved for other applicants mirrored those denied and prohibited for the plaintiffs. *See, e.g.*, First Am. Compl. ¶ 30 (FAS "continued to approve the rented trade flow transactions of other participants that appeared on their face no different than GTR's transactions"); *see also XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 76 (D.D.C. 2015) (finding that plaintiff's allegation that her "loan application was equally as meritorious as the applications of Tesla and Fisker . . . manifestly suffice[d] to establish that [she] [wa]s similarly situated to other . . . loan applicants" for purposes of class-of-one claim).

Thus, the Court concludes that the plaintiffs are similarly situated to other program participants for purposes of this suit.[8]

The second element—that no rational basis exists to support the disparate treatment— requires the plaintiff to overcome a "strong presumption of validity." *Tate v. Dist. of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010) (internal quotation marks omitted). "Even at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not any reasonable conceivable state of facts that could provide a rational basis for the classification." *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (per curiam) (internal quotation marks omitted). "[T]he rational basis inquiry is highly deferential to the government," and "an equal protection claim fails under Rule 12(b)(6) if the complaint itself suggests a rational basis for the government action." *XP Vehicles, Inc.*, 118 F. Supp. 3d at 76 (internal quotation marks omitted). Moreover, unlike with arbitrary and capricious review under the APA, "the government may defend the rationality of its actions on any ground it can muster,

---

[8] The defendants resist this conclusion, arguing variously that most of the plaintiffs' references to unnamed "similarly situated" applicants are too vague to be credited, that Cargill is a large "key player" in the industry, that Bunge is "multinational" in scope, that Grove Services is a wildcard with no details provided in the complaint, and that the plaintiffs failed to allege that the approved transactions were made in the same manner and for the same purpose as the plaintiffs' transactions. *See* Defs.' Mot. at 17–18. The Court, however, finds the plaintiffs' references to Cargill, Bunge, and Grove Services, as well as their detailed descriptions of rented trade flow transactions, more than adequate to survive a motion to dismiss. *See* First Am. Compl. ¶¶ 18, 19–23, 24, 25 (describing the mechanics and purpose of rented trade flow transactions); ¶¶ 25, 34, 64, 80, 100, 104 (describing Cargill's, Bunge's, Grove Services', and other participants' use of rented trade flows); *see also XP Vehicles, Inc.*, 118 F. Supp. 3d at 45, 76 (finding "now-dissolved" minor player in clean energy market similarly situated to large and sophisticated competitor, Tesla, for purposes of class-of-one equal protection claim). The defendants also argue that the plaintiffs do not actually know the details of other participants' transactions. Defs.' Reply at 3–4. But the plaintiffs' actual knowledge is irrelevant at this stage; it matters only that the plaintiffs have alleged that such transactions exist.

not just the one articulated at the time of decision." *RJB Props., Inc. v. Bd. of Ed. of the City of Chicago*, 468 F.3d 1005, 1010 (7th Cir. 2006) (internal alteration and quotation marks omitted).

In this case, the fact that Lillemoe was subject to investigation for fraud at the time of the alleged disparate treatment, *see* First Am. Compl. ¶ 82; *see also id.* Ex. J., Dkt. 25-10 (letter from Calderon to USDA Office of Inspector General stating that "the investigation began in mid 2011"), provides a rational basis for FAS treating Lillemoe's and GTR's applications differently from those of other participants, particularly with respect to the use of rented trade flows. As Rowse explained in his meeting with Lillemoe on February 20, 2013, one of FAS's primary concerns with rented trade flow transactions was "the risk that two or more parties might each apply for a GSM-102 guarantee based on the same shipment or BL." *Id.* ¶ 60. Although the plaintiffs allege that "precautions [we]re taken to prevent [shipments] from being double-counted under the Program," *id.* ¶ 24, it is conceivable that FAS's concerns about double-counting would apply with special force to an applicant implicated in ongoing fraud investigations in connection with the program. That is especially true considering FAS's investigation did not come up empty, but was ultimately referred to the USDA Office of Inspector General and the U.S. Attorney's Office for the District of Connecticut, *id.* ¶ 82, and culminated in a twenty-three count indictment and five count guilty verdict for conspiracy and wire fraud based on Lillemoe's involvement in the program. *Lillemoe*, 242 F. Supp. 3d at 112–14. Although the indictment and conviction themselves did not exist until well after the alleged course of disparate treatment began, it is conceivable that facts discovered in the course of investigating Lillemoe would make FAS particularly wary of transactional structures that could be used to obtain multiple guarantees unlawfully. *Cf. Yacovone v. Bailar*, 455 F. Supp. 287, 289 (D.D.C. 1978) (considering whether facts associated with a conviction supplied rational basis for state action even though the "fact of

19

conviction" was made legally irrelevant by a subsequent pardon). Further, since Lillemoe's

criminal trial focused on allegations that Lillemoe and his business partner "created multiple

entities to maximize their share of the limited number of GSM-102 guarantees," *Lillemoe*, 242 F.

Supp. 3d at 113–14, it would be rational for FAS to extend the same suspicion to entities

associated with Lillemoe, such as GTR.

Moreover, the Supreme Court has emphasized that class-of-one claims are a distinctly

poor fit for evaluating "state action" that "involve[s] discretionary decisionmaking based on a

vast array of subjective, individualized assessments." *Engquist v. Or. Dep't of Agr.*, 553 U.S.

591, 603 (2008). In reviewing discretionary decisions, "the rule that people should be treated

alike, under like circumstances and conditions is not violated when one person is treated

differently from others, because treating like individuals differently is an accepted consequence

of the discretion granted" and "allowing a challenge based on the arbitrary singling out of a

particular person would undermine the very discretion that such state officials are entrusted to

exercise." *Id.* (internal quotation marks omitted). Given the discretion afforded FAS in

administering the program and acting on thousands of individual guarantee applications—and

the fact Lillemoe was subject to a fraud investigation that ultimately led to a criminal

conviction—the Court will not second-guess FAS's decision to prevent Lillemoe and GTR from

using rented trade flow transactions in the program, even while allowing others to do so at the

same time. Because the Court finds that a conceivable state of facts could have provided a

rational basis for the government's decision, it will dismiss count II.

### D. The Plaintiffs' *Bivens* Claims Against Rowse and Doster

The plaintiffs also seek monetary damages from Rowse and Doster in their personal

capacities under the implied cause of action theory of *Bivens v. Six Unknown Fed. Narcotics*

*Agents*, 403 U.S. 388 (1971). The Supreme Court recently clarified the correct approach to

inferring causes of action for damages directly under the Constitution in *Ziglar v. Abbasi*, 137 S.

Ct. 1843 (2017). It explained that *Bivens* was decided in a forgotten era in which courts freely

implied private rights of action to promote congressional purposes unmoored from statutory text.

*Id.* at 1855. When the Court abandoned that approach in the statutory context for one focused

narrowly on congressional intent, it developed a "similar caution with respect to actions in the

*Bivens* context." *Id.* at 1856. Indeed, "the changes to the Court's general approach to

recognizing implied damages remedies" were so significant that "it is possible that the analysis

in the Court's [first] three *Bivens* cases might have been different if they were decided today."

*Id.* Although *Bivens* remains settled "in the search-and-seizure context in which it arose," the

Court "has made clear that expanding the *Bivens* remedy is now a disfavored judicial activity."

*Id.* at 1856–57 (internal quotation marks omitted). Thus, the Court "has consistently refused to

extend *Bivens* to any new context or new category of defendants." *Id.* at 1857 (internal quotation

marks omitted).

"When a party seeks to assert an implied cause of action under the Constitution" today,

"separation-of-powers principles are or should be central to the analysis." *Id.* Ordinarily,

Congress is better suited than the courts "to consider if the public interest would be served by

imposing a new substantive legal liability." *Id.* (internal quotation marks omitted). Courts must

therefore exercise "caution before extending *Bivens* remedies into any new context," and "a

*Bivens* remedy will not be available if there are special factors counseling hesitation in the

absence of affirmative action by Congress." *Id.* (internal quotation marks omitted). "[T]he

decision to recognize a damages remedy requires an assessment of its impact on governmental

operations systemwide," including "the burdens on Government employees who are sued

personally, as well as the projected costs and consequences to the Government itself when the

tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." *Id.* at 1858. Further, "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

A case "presents a new *Bivens* context" if it "is different in a meaningful way from previous *Bivens* cases decided by this Court." *Id.* at 1859.[9] The parties here do not dispute that the plaintiffs' class-of-one equal protection challenges present a new *Bivens* context. *See* Pls.' Opp'n at 38 (arguing that "this Court should extend *Bivens* to Plaintiffs' Equal Protection claims"). And for good reason: none of the three cases in which the Court has approved of implied damages under the Constitution involved an administrative agency, a class-of-one equal protection theory, a federal program, agricultural exports, or structured trade finance transactions. *See Abbasi*, 137 S. Ct. at 1854–55 (summarizing the three cases). Thus, the Court must exercise "caution" and consider whether any "special factors counsel[] hesitation" before extending *Bivens* to the plaintiffs' claims. *Id.* at 1857 (internal quotation marks omitted).

Some courts have concluded that the availability of "judicial review under APA standards is alone sufficient to preclude a *Bivens* action." *Carpenter's Produce v. Arnold*, 189 F.3d 686, 688 (8th Cir. 1999); *see also Miller v. U.S. Dep't of Agric. Farm Servs. Agency*, 143 F.3d 1413,

---

[9] The Court provided the following non-exhaustive list of possible differences that might "make a given context a new one":

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

1416–17 (11th Cir. 1998) (holding availability of APA review precluded *Bivens* claim); *Moore v. Glickman*, 113 F.3d 988, 994 (9th Cir. 1997) (same). Before *Abbasi*, a judge of this court declined to go so far, concluding instead that only "the APA's judicial review provisions *in conjunction with* [other] substantive statutory schemes" could preclude *Bivens* relief. *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71–72 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). Yet, another judge on this Court—also before *Abbasi*—refused to extend *Bivens* to class-of-one claims strikingly similar to those brought here. *See XP Vehicles, Inc.*, 118 F. Supp. 3d at 69–72. In *XP Vehicles*, the plaintiff had alleged selective treatment by an agency in administering a federal loan program, and the court concluded that the availability of APA review, combined with the substantive statutory and regulatory provisions governing the loan program, warranted hesitation, as did the fact the "precise scope of th[e] action remain[ed] uncertain." *Id.* at 69–71.

Here, the availability of APA review—perhaps alone, but certainly in combination with substantive program regulations—likewise warrants hesitation. *See Jangjoo v. Sieg*, 319 F. Supp. 3d 207, 217–18 (D.D.C. 2018) (observing, post-*Abbasi*, that "an alternative remedial structure exists through the Administrative Procedure Act" and that "this comprehensive statutory scheme . . . counsels against the creation of a *Bivens* remedy"). And, as in *XP Vehicles*, the scope of the *Bivens* action requested would be uncertain. On the facts alleged here, it would risk substantial overlap with potential state-law defamation and tortious interference claims. *See* First Am. Compl. ¶ 114 (describing Rowse's communications to Deutsche Bank "with an intent to defame GTR and Mr. Lillemoe and tortuously interfere in their business"); ¶ 125 ("Rowse continued to defame and harm GTR and Mr. Lillemoe" by raising issues to Deutsche Bank about the authenticity of documents); ¶ 126 (alleging that "Rowse's unlawful and unnecessary

communications with Deutsche Bank" cost the plaintiffs "a 13-year relationship"); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73–74 (2001) (rejecting *Bivens* claim where state tort law provided alternative means for relief). And it could implicate a variety of employee actions ranging from high-level policy determinations, *see* First Am. Compl. ¶ 79 (alleging that Rowse "approve[d] rented trade flow transactions for more than a decade"), to discretionary investigatory decisions, *see* First Am. Compl. ¶ 132 (alleging that Doster "spearheaded an investigation against Mr. Lillemoe"), routine deadline extensions, *see id.* ¶ 133, and the disclosure of information, *see id.* ¶ 135. Moreover, the task of adapting rational basis review to discretionary decisionmaking would expose a host of agency employees to uncertain liability and would force courts to constantly meddle in executive branch action at a granular level. *See Jangjoo*, 319 F. Supp. 3d at 217 (rejecting *Bivens* claim post-*Abbasi* in part because "[e]xtending *Bivens* to this context would likely . . . lead to increased litigation and subject the agency to the burdens of discovery and the litigation process"). The Court finds that these factors warrant "hesitation," and it declines to extend *Bivens* to the present context. The Court will therefore dismiss counts III and IV.

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion in part and denies it in part. Count I may proceed, subject to the limitations on equitable relief stated in this opinion. Counts II, III, and IV are dismissed.

DABNEY L. FRIEDRICH
United States District Judge

Date: September 25, 2018