## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRETT LILLEMOE, *et al.*,

       *Plaintiffs*,

  v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, FOREIGN
AGRICULTURAL SERVICE,

       *Defendant*.

No. 15-cv-2047 (DLF)

## <u>MEMORANDUM OPINION</u>

Plaintiffs Brett Lillemoe and GTR, LLC bring this suit against the U.S. Department of Agriculture's Foreign Agricultural Service (FAS), which administers a federal program designed to finance U.S. agricultural exports. They assert that FAS violated the Administrative Procedure Act (APA) by selectively applying its program regulations and policies. Before the Court is FAS's Renewed Motion for Summary Judgment, Dkt. 89, and FAS's Renewed Partial Motion to Dismiss for Lack of Standing, Dkt. 90. For the reasons that follow, the Court will grant in part FAS's Partial Motion to Dismiss and grant FAS's Motion for Summary Judgment.

## I.    BACKGROUND

As explained in detail in this Court's earlier Memorandum Opinion, *Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*, 344 F. Supp. 3d 215 (D.D.C. 2018), FAS administers the Export Guarantee Program (GSM-102) on behalf of the Commodity Credit Corporation (CCC). Am. Compl. ¶ 7, Dkt. 25; *see also* 7 U.S.C. § 5622; 7 C.F.R. § 1493, *et seq*. The GSM-102 program is designed to encourage exports of agricultural commodities by financing exports of these products. *See* 7 U.S.C. § 5622(a)–(b). According to the plaintiffs, in a "typical"

transaction under the GSM-102 program, a U.S. exporter negotiates an export sale with an importer in a qualifying region and applies to FAS for a GSM-102 guarantee based on the sale. *Lillemoe*, 344 F. Supp. 3d at 220.  If the application is approved, the importer then causes a foreign bank issues a letter of credit (LC) in favor of the U.S. exporter.  *Id*.  Meanwhile, the U.S. exporter assigns its right to payment on the LC to a U.S bank and the foreign bank can refinance its obligations under the LC to repay the U.S. bank on deferred terms.  *Id*.  The GSM-102 program guarantees that obligation to the U.S. bank, so that if the foreign bank defaults, the U.S. bank can recover a portion of its losses from the government.  *Id*.  In essence, the transaction embodies a government-backed loan from the U.S. bank to the foreign bank.  *Id*.

In their complaint, the plaintiffs allege that some program participants use a different transaction structure called a "rented trade flow."  Under this structure, two separate transactions occur: (1) a physical sale of goods between an entity shipping the goods (or "Actual Exporter") and a foreign importer (or "Consignee"); and (2) a purely financial "sale" between a "GSM Exporter" and a "GSM Importer," who submit the guarantee applications to FAS.  *Id.* at 221. The GSM Exporter acquires the right to use bills of lading (BLs) and other shipping documents for a fee, and they qualify for the guarantee by using photocopies of these documents.  *Id*.  The GSM Exporter and GSM Importer then "rent" the trade flow through an offsetting sale and repurchase, whereby the underlying goods are sold from the Actual Exporter to the GSM Exporter, from the GSM Exporter to the GSM Importer, and from the GSM Importer back to the Actual Exporter, without the goods ever physically changing hands.  *Id*.

Lillemoe and his company, GTR, claim that FAS approved their "rented trade flow" transactions since at least 2009.  *See id.* at 222.  But according to the plaintiffs, in 2012, FAS adopted a *de facto* policy in which it singled them out and refused to approve their "rented trade

flow" applications, while at the same time approving others' applications that were based on the same structure. *See id*. at 222–24.

The plaintiffs' claim centers on a series of events that took place from late 2012 to 2013. They allege that in Fall 2012, FAS personnel contacted Lillemoe to request additional information about the transaction structures underlying several of GTR's recent and pending program applications. *Id*. at 222.  Lillemoe responded that this transaction structure—the so-called "rented trade flow"—had been vetted by FAS officials in 2009 and other program participants were using the same structure. *Id*.  On December 28, 2012, FAS denied the 15 pending guarantees and stated that "any future applications utilizing the same structure will also be denied." *Id*.  The plaintiffs allege that based on this representation, they then withdrew three pending applications in January 2013 that used "rented trade flows" and requested that FAS refund their application fees. *Id*.  FAS denied this request. *Id*. at 222–23.  The plaintiffs also allege that in January 2013, FAS delayed approval of three other applications for transactions with Bancolombia that allegedly did not use the "rented trade flow" structure. *Id*. at 223.  After FAS took two weeks to approve these guarantees, Bancolombia pulled out of the transactions, and FAS again declined to reimburse the fees for one of the guarantees. *Id*.  In another instance later in 2013, the plaintiffs allege that an FAS official informed Deutsche Bank, a U.S. bank with which the plaintiffs had several pending guarantees, about potential "discrepancies" in GTR's documents, ultimately causing Deutsche Bank to terminate its relationship with the plaintiffs. *Id*. FAS also refused to refund the fees paid in connection with these guarantees. *Id*. ¶ 223–24.

In 2015, the plaintiffs were indicted for conspiracy and wire fraud based on false documentation they submitted in the GSM-102 program, and FAS subsequently suspended them from the program. *See* Def.'s First Mot. for Summ. J. Ex. A at 1–2, Dkt. 59-2.  In November

3

2016, Lillemoe was convicted at trial, and FAS debarred him and GTR from participating in the program until April 28, 2020. *Id*. at 1, 3. In December 2019, the Second Circuit Court of Appeals affirmed his conviction. *See United States v. Calderon*, 944 F.3d 72, 84 (2d Cir. 2019).

The plaintiffs filed this suit in 2015, bringing claims under the APA, Fifth Amendment, and *Bivens*. *See* Compl., Dkt. 1. On September 25, 2018, the Court dismissed all but the APA claims. *See Lillemoe*, 344 F. Supp. 3d at 233. The Court concluded that the plaintiffs had plausibly alleged a claim under the APA because FAS did not provide reasons for treating the plaintiffs differently than other similarly situated applicants. *See id.* at 227–28.

On February 22, 2019, FAS filed a motion for summary judgment, Dkt. 59, and on April 26, 2019, it filed a partial motion to dismiss for lack of standing, Dkt. 72. The Court denied the motion for summary judgment without prejudice on September 30, 2019, concluding that FAS failed to directly address the plaintiffs' claim that FAS rejected the plaintiffs' applications based on the alleged "rented trade flow" structure while simultaneously approving other participants' applications that used "rented trade flows." *See* September 30, 2019 Order at 6–7, Dkt. 86. On October 21, 2019, the Court held a hearing on FAS's partial motion to dismiss, and denied the motion without prejudice so that FAS could file an omnibus submission to address the outstanding issues. *See* Def.'s Mot. for Extension of Time, Dkt. 87; October 25, 2019 Minute Order.

On November 19, 2019, the defendants filed this renewed Motion for Summary Judgment, Dkt. 89, and renewed Partial Motion to Dismiss for Lack of Standing, Dkt. 90. For the reasons that follow, the Court will grant both motions.[1]

---

[1] Also before the Court is the plaintiffs' Motion for Discovery, Dkt. 94, and FAS's Motion for Protective Order, Dkt. 100. Discovery is generally not permitted in APA cases unless a party

## II.    MOTION TO DISMISS

### A.    Legal Standard

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss an action or claim when the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion for dismissal under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Federal district courts are courts of limited jurisdiction, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Thus, "the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

"When ruling on a Rule 12(b)(1) motion, the court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (internal quotation marks omitted). Those factual allegations, however, receive "closer scrutiny" than they would if the court were considering a Rule 12(b)(6) motion for failure to state a claim. *Id.* Also, unlike in the Rule 12(b)(6) context, a court may consider documents outside the pleadings

---

"can demonstrate unusual circumstances justifying a departure from this general rule." *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991). Discovery is warranted only if (1) the agency "deliberately or negligently excluded documents that may have been adverse to its decision," (2) background information was needed "to determine whether the agency considered all the relevant factors," or (3) the "agency failed to explain administrative action so as to frustrate judicial review." *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010) (internal quotation omitted). The plaintiffs make no showing that FAS deliberately or negligently excluded documents from the administrative record, and the Court concludes that the record is sufficient for judicial review. *See infra* Part III.B. The plaintiffs thus have not demonstrated any "unusual circumstances" supporting additional discovery. The Court will deny the plaintiffs' motion for discovery and deny as moot FAS's motion for a protective order.

to evaluate whether it has jurisdiction, but it still must "accept all of the factual allegations in [the] complaint as true." *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (internal quotation marks omitted).  If, at any point, the court determines that it lacks jurisdiction, the court must dismiss the claim or action.  Fed. R. Civ. P. 12(b)(1), 12(h)(3).

### B.    Analysis

In its partial motion to dismiss, FAS argues that the plaintiffs lack Article III standing as to their APA claim that FAS adopted a *de facto* policy of denying their "rented trade flows" applications while approving those of other program participants.  To establish standing, a plaintiff must demonstrate (1) a concrete injury in fact that is (2) fairly traceable to the defendant's action and (3) redressable by a favorable judicial decision.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  The plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).  When evaluating whether a plaintiff has standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

The Court previously permitted the plaintiffs to seek two forms of equitable relief: (1) restitution of fees they paid to FAS for their failed GSM-102 transactions and (2) injunctive relief ordering FAS to cease applying its policy with respect to "rented trade flows" arbitrarily. *See Lillemoe*, 344 F. Supp. 3d at 225–27.

### 1.    *Reimbursement of Fees*

FAS concedes that the plaintiffs have standing to challenge FAS's decision to deny the plaintiffs' requests to reimburse their application fees with respect to three GSM-102 applications for transactions in Turkey.  Def.'s Reply in Support of its First Mot. to Dismiss at 1,

Dkt. 76.  But the Court "has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  *Summers*, 555 U.S. at 499.

The plaintiffs have met their burden with respect to the application fees related to the Turkey transactions.  First, the plaintiffs have shown that they suffered an injury when FAS declined to reimburse the application fees.  *See* Am. Compl. ¶ 53.  Second, this injury is fairly traceable to the conduct challenged by the plaintiffs—FAS's alleged policy of selectively banning the plaintiffs from using "rented trade flows."  *Id*.  The plaintiffs allege that they withdrew the Turkey applications because of FAS's representations to Lillemoe that it would no longer approve transactions that used the "rented trade flow" structure.  *Id*. ¶¶ 53–54.  Finally, a favorable decision by this Court would enable the plaintiffs to recover these fees.  Thus, the plaintiffs have standing to challenge FAS's alleged policy of selectively banning the plaintiffs' use of rented trade flows to the extent that it caused them to lose the fees on the Turkey guarantees.

But the plaintiffs do not have standing to challenge FAS's refusal to reimburse the fees related to the Bancolombia and Deutsche Bank transactions.  The plaintiffs allege in the complaint that FAS violated the APA by rejecting "GSM-102 applications submitted by GTR because of its use of rented trade flows under the Program while approving GSM-102 applications from other participants that used the same structure."  Am. Compl. ¶ 92.  The scope of the plaintiffs' APA claim is thus limited to an alleged FAS policy that "selectively prohibit[ed] the plaintiffs from using rented trade flows while simultaneously approving applications from other participants using the same structure."  *Lillemoe*, 344 F. Supp. 3d at 227.  Because the plaintiffs concede that they did not use "rented trade flows" in the three Bancolombia transactions, *see* Am. Compl. ¶ 55, or the seven Deutsche Bank transactions, *see*

Am. Compl. ¶ 70, these transactions are not fairly traceable to the challenged conduct, and a favorable decision from this Court could not redress those injuries.  Accordingly, the plaintiffs cannot seek reimbursement of fees from these GSM-102 transactions in this case.

2.    *Injunctive Relief*

The plaintiffs lack standing for the injunctive relief they seek—an order prohibiting "FAS from unequally applying its regulations in the future."  Pls.' Opp'n to Def.'s Renewed Mot. to Dismiss at 1, Dkt. 91.[2]  For claims of equitable relief based on future injury, a plaintiff faces "a more rigorous burden to establish standing."  *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989).  When plaintiffs seek injunctive relief, "past injuries alone are insufficient to establish standing."  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  A plaintiff instead must show "ongoing injury" or face "an immediate threat of injury."  *Id.*  The "threatened injury must be certainly impending to constitute injury in fact," and "allegations of *possible* future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citation omitted) (emphasis in original).  Future injuries with merely an "objectively reasonable likelihood" of occurring are not adequate to establish standing.  *Id.*

The series of injuries the plaintiffs allege here are either past injuries that injunctive relief cannot redress or possible future injuries that are too speculative.  The plaintiffs allege that FAS acted arbitrarily by denying fifteen of GTR's pending GSM-102 applications involving "rented

---

[2] It is unclear whether the plaintiffs request declaratory relief in addition to injunctive relief.  In its Memorandum Opinion on FAS's original motion to dismiss, the Court concluded it would permit the plaintiffs' "request that FAS be ordered to apply its [regulations] equally to similarly situated applicants."  *Lillemoe*, 344 F. Supp. 3d at 226.  In their brief, the plaintiffs argue that they seek "a finding that FAS disparately applied its regulations to Plaintiffs."  Pls.' Opp'n to Def.'s Renewed Mot. to Dismiss at 1.  Regardless of whether the plaintiffs seek declaratory relief in addition to injunctive relief, the same standing analysis applies.  *See Lyons*, 461 U.S. at 104; *Golden v. Zwickler*, 394 U.S. 103, 109 (1969).

trade flow" agreements, *id.* ¶ 49; delaying authorization of three other applications, *id.* ¶¶ 56–58; raising issues with Deutsche Bank about "discrepancies" in GTR's supporting documentation, causing Deutsche Bank to end its business with GTR, *id.* ¶¶ 69–74; and failing to refund the plaintiffs' application fees without explanation, *id.* ¶¶ 53; 58; 75.  But all of these are past injuries, and the plaintiffs have not established that they are suffering any continuing harm from them.  *See Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that plaintiff seeking injunctive relief who alleges past harm has no standing if there is no real and immediate threat the harm would occur again).

The plaintiffs also allege a *possibility* of future injury, but this injury will occur only if the plaintiffs reenter the GSM-102 program and face continued disparate treatment, and both conditions are too speculative.  The plaintiffs are currently debarred from the GSM-102 program until April 28, 2020, *see* Def.'s First Mot. for Summ. J., Ex. A, and as such, they cannot yet submit any applications.  In a declaration, Lillemoe suggests that he *could* participate in the program once his debarment ends, but he does not specify whether he actually plans to submit an application.  *See* Pls.' Opp'n to Def.'s Renewed Mot. to Dismiss Ex. 3 (First Lillemoe Decl.) ¶ 67, Dkt. 92-1.  But even if Lillemoe does intend to participate in the program again, his claimed injury lacks concreteness because he does not provide any specifics about his plans for future participation.  *See Lujan*, 504 U.S. at 564 ("such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Moreover, the Second Circuit recently upheld Lillemoe's criminal conviction, *see Calderon*, 944 F.3d at 84, and it is unclear whether Lillemoe will be able to submit an application to the GSM-102 program while he is serving his 15-month sentence.  The plaintiffs'

counsel also suggested during a motions hearing that Lillemoe must overcome "other hurdles" before he can apply for a GSM-102 guarantee again. October 21 Hr'g Tr. at 44:14–:20. Further, approving any future GSM-102 application falls within the discretion of FAS personnel, *see* 7 C.F.R. § 1493.70(b), so it is speculative at best whether the plaintiffs will subject to the same treatment as they faced in the past.

Lastly, even if the plaintiffs could apply to the program once their debarment ends, the transactions covered by GSM-102 involve the participation of several additional parties—an importer, a foreign bank, and a U.S. bank—so it is unclear whether these other parties will agree to work with the plaintiffs in the future. This mere possibility of future injury rests on too many inferences for the Court to conclude that injury is "certainly impending." *See Conference of State Bank Supervisors v. Office of Comptroller of Currency*, 313 F. Supp. 3d 285, 296–97 (D.D.C. 2018).

The plaintiffs' alternative argument that they have standing to challenge the harm that FAS allegedly inflicted upon their reputation similarly fails. *See* Pls.' Opp'n to Def.'s Renewed Mot. to Dismiss at 10–12. Injury to reputation can "suffice for purposes of constitutional standing." *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001). But, as they are here, "claims of reputational injury can be too vague and unsubstantiated" to support standing. *McBryde*, 264 F.3d at 57. For one, the plaintiffs have not shown how the alleged harms—the rejection of 15 applications, the refusal to reimburse application fees, the delayed decisions on three other applications, and the discussion with Deutsche Bank about GTR's deficient paperwork—broadly impacted their reputations in the structured trade finance market. All of these interactions occurred primarily between the plaintiffs and FAS, a far cry from the "public reprimand" for

which the Court found standing in *McBryde*. *Id*. at 56.  The plaintiffs also have not shown any

reputational harm that is "fairly traceable" to FAS's actions.  Lillemoe himself states that he had

been under criminal investigation since October 2011, and that federal investigators had

questioned and served subpoenas on "numerous clients" of his as early as 2011.[3]  First Lillemoe

Decl. ¶ 63.  Thus, any reputational injury to the plaintiffs likely derives from a wholly separate

government action than the one the plaintiffs challenge in this lawsuit.  *See Foretich v. United*

*States*, 351 F.3d 1198, 1214 (D.C. Cir. 2003) ("Reputational injury that derives *directly from*

*government action* will support Article III standing to challenge *that action*" (emphasis added)).

And to the extent that the plaintiffs allege that FAS approached Deutsche Bank to deliberately

harm their reputations, as detailed in *infra* Part III.B.4., the record does not bear this out.  To the

contrary, the record reveals that an employee from Deutsche Bank reached out to representatives

at FAS raising issues with "discrepancies" in the documentation from GTR.  Administrative

Record (AR) 666.  The plaintiffs provide no evidence that FAS "deliberately defamed them

before Deutsche Bank," Am. Compl. ¶ 72, and on a Rule 12(b)(1) motion, the Court may

consider materials outside the pleadings to evaluate whether it has jurisdiction, such as

"undisputed facts evidenced in the record."  *See Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192,

197 (D.C. Cir. 1992).

   Lastly, the plaintiffs have failed to show that this alleged reputational injury is ongoing.

*See Lyons*, 461 U.S. at 105.  The reputational injuries at issue in the cases cited by the plaintiffs

both involved continuing harm to reputations—in *McBryde*, the reprimand causing the injury

---

[3] In fact, during this period and throughout 2012, FAS continued to approve the plaintiffs'
GSM-102 applications.  *See* Am. Compl. ¶ 41.  And the plaintiffs themselves allege that their
disparate treatment began in late 2012.  *See* Pls.' Reply in Support of its Discovery Mot. at 17,
Dkt. 104 ("A substantial part of Plaintiffs' case is based on FAS not singling Plaintiffs out until
December 28, 2012").

"continue[d] to be posted on the web site of the Fifth Circuit Court of Appeals," *McBryde*, 264 F.3d at 57, and in *Forteich*, the challenged federal statute that "effectively brand[ed]" the plaintiff "a child abuser and an unfit parent" remained on the books, *Foretich*, 351 F.3d at 1214. Here, the plaintiffs have not established that FAS's alleged policy of selectively prohibiting the plaintiffs from engaging in "rented trade flows" has continued to cause them reputational harm. In sum, it is unclear whether the plaintiffs actually suffered any "concrete" reputational injury that is "fairly traceable" to FAS's actions. *See Summers*, 555 U.S. at 493. The plaintiffs have therefore failed to establish that they have standing to seek the requested injunctive relief.

## III.   MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. Here, the plaintiffs seek review of agency action, invoking the APA's requirement that a court "hold unlawful and set aside" any aspect of a final agency action that is "arbitrary [and] capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). In other

12

words, "the entire case . . . is a question of law" and the district court "sits as an appellate tribunal." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and internal quotation marks omitted).

Arbitrary and capricious review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (alteration adopted and internal quotation marks omitted). A court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Rather, its review is limited to whether the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43).

In conducting this inquiry, a court does "not look at the agency's decision as would a scientist, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 249 (D.C. Cir. 2013) (alteration adopted and internal quotation marks omitted); *see also Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1263 (D.C. Cir. 1994) (describing the standard as "indulgent"). "Even an agency 'decision of less than ideal clarity' should be upheld 'if the agency's path may be reasonably discerned.'" *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 222 (D.D.C. 2011) (quoting *State Farm*, 463 U.S. at 43)). The party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

B.       **Analysis**

Agency action is arbitrary and capricious under the APA if "the agency offers insufficient reasons for treating similar situations differently." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (citing *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C.Cir.1999)). A "fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

The plaintiffs allege that they were treated differently than similarly situated participants in the GSM-102 program because FAS operated according to a "*de facto*" unwritten policy that prohibited the plaintiffs from using the "rented trade flow" model but allowed others to do so. *See* Pls.' Opp'n to Def.'s Renewed Mot. to Dismiss at 2. Rather than challenging any one decision by FAS, the plaintiffs insist they are challenging FAS's alleged *de facto* policy as a whole. *See* Pls.' Opp'n to Def.'s First Mot. for Summ. J. at 5–10, Dkt. 64.

As circumstantial evidence that FAS maintained a "policy" of singling them out, the plaintiffs highlight four actions by FAS: (1) its December 28, 2012 rejection of 15 of the plaintiffs' GSM-102 applications that used the "rented trade flow" structure and FAS's accompanying statement that it would deny "any future applications utilizing the same structure," *see* Am. Compl. ¶ 50; (2) its failure to refund GTR's fees for several GSM-102 guarantees in Turkey that the plaintiffs allegedly terminated based on their understanding of FAS's position on "rented trade flows," *see id.* ¶ 53; (3) its delayed approval of several of the plaintiffs' GSM-102 guarantees in South America and its refusal to refund the fees for one of the guarantees, *see id.* ¶¶ 56–58; and (4) its decision to raise "discrepancies" in the plaintiffs' GSM-102 documents with Deutsche Bank—causing Deutsche Bank to stop doing business with the

plaintiffs—and its subsequent refusal to reimburse the corresponding fees, *see* Am. Compl. ¶¶ 70–75.

But these four actions do not demonstrate that FAS had an "unwritten" policy of treating the plaintiffs differently than other GSM-102 program participants.  Indeed, Amy Slusher, the Acting Senior Director of the Credit Programs Division at FAS, provided sworn testimony that FAS "did not treat Lillemoe or his company, GTR, any differently from other GSM-102 applicants."  First Slusher Decl. ¶ 32, Dkt. 89-2.  Moreover, the administrative record shows that even after FAS's alleged discriminatory conduct, FAS approved more than 21 applications from GTR in 2013.  *See id.* ¶ 29; AR 949.  And as set forth below, each of FAS's four actions is amply supported by the record, and therefore, was not arbitrary and capricious.  Apart from these four, discrete adverse actions, the plaintiffs are unable to identify, and the record does not contain, *any* evidence that FAS had an overarching policy to selectively ban the plaintiffs from engaging in "rented trade flows."  For these reasons, the plaintiffs have failed to establish the existence of a *de facto* policy of arbitrary treatment towards them.[4]  *See Celotex Corp. v. Catrett*,

---

[4] FAS also argues that the plaintiffs' claim of selective treatment fails because it does not identify any "final agency action," as is required for judicial review under the APA.  *See* Def.'s Reply in Support of its Renewed Mot. for Summ. J. at 9 n. 6, Dkt. 99; Def.'s First Mot. for Summ. Judgment at 6–9, Dkt. 59-1.  Because the Court concludes that the record contains no evidence that FAS had a *de facto* policy of treating the plaintiffs differently than other program participants, there is no final agency action for the Court to review.  *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (holding an agency action is final if it is both "the consummation of the agency's decisionmaking process" and a decision by which "rights or obligations have been determined" or from which "legal consequences will flow").  This case is akin to *Bark v. United States Forest Serv.*, 37 F. Supp. 3d 41 (D.D.C. 2014), in which the court granted summary judgment in favor of the U.S. Forest Service against a challenge to an alleged "policy and practice" of permitting park concessioners to charge fees for parking.  *Id*. at 50.  There, plaintiffs pointed to "no written rules, orders, or even guidance documents of the Forest Service that set forth the supposed policies challenged," and they could not attach a "'policy' label to their own amorphous description" of the agency's practices.  *Id*.  Similarly, in this case, the administrative record contains "no written rules, orders or even guidance documents" supporting the plaintiffs' "amorphous description" of FAS's alleged "policy" of discrimination.

477 U.S. 317, 323 (1986) (holding that Rule 56 mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

      1.     *The December 28, 2012 Letter*

FAS's explanation for denying the plaintiffs' guarantee applications in its December 28, 2012 letter meets the "minimal standards of rationality" required to survive arbitrary and capricious review.  *See Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d at 249.

FAS asserts that it made its decision "largely based on the insufficiency of the responses by GTR to questions from FAS relating to the twelve previously approved guarantees."  First Slusher Decl. ¶ 28.  From December 2011 to May 2012, FAS approved and issued 12 GSM-102 guarantees to GTR in connection with the export of breeding cattle and horses.  First Slusher Decl. ¶ 8.  These applications listed the importer as A. Charles Trading, *id*. ¶ 9, but in contravention of the applicable GSM-102 regulations, the applications did not contain "a statement that the commodity will be shipped directly to the importer in the destination country," First Slusher Decl. ¶ 10; *see* 7 C.F.R. § 1493.40(a)(3) (2012).  Because FAS routinely inquires when GSM-102 applications do not contain this statement, FAS asked GTR to provide the name of the importer's presence of business in the destination country.  *Id*.  GTR later provided the name, address, and contact information for the importer's presence of business in Moscow.  *Id*.

Separately, Cristina Bergomi, an employee of HSBC Bank, emailed FAS on October 3, 2012 regarding an attempt to acquire financing through the Export-Import Bank of the United States (Ex-Im Bank) for "the purchase of cattle from Az Tx Cattle Company of Hereford Texas" by Bryansk Meat Company, LLC, a Russian importer.  *Id*. ¶ 11; AR 90.  According to Bergomi,

the same bills of lading underlying HSBC's export transaction were already used for GSM-102 guarantees with FAS.  First Slusher Decl. ¶ 12; AR 86–90.[5]  After an investigation, FAS determined that the bills of lading identified by FAS corresponded with GTR's 12 GSM-102 guarantees involving breeding cattle and horses.  First Slusher Decl. ¶¶ 15–16.

　　Mark Rowse, the director of FAS's Credit Division at the time, sent an email to Lillemoe stating that he had learned that "the shipments reported under the referenced guarantees registered by GTR were also likely the basis of an application under a program of" the Ex-Im Bank.  AR 94.  Rowse explained that "these guarantees were in fact shipped directly to a Russian importer other than A. Charles Trading by a U.S. exporter other than GTR" and that "neither the name of that Russian bank nor the Russian importer appears in any documentation that you submitted in obtaining the GSM-102 guarantees or reporting your exports."  *Id*.  Rowse then requested more information from the plaintiffs about these guarantees, including a description of "how GTR executed an export sale of cattle and horses to Russia when the sale of the same cattle and horses had been executed by parties entirely unrelated to the GTR transactions represented in your application."  *Id*.

　　On November 8, 2012, the plaintiffs' attorney, Mark Larsen, responded to Rowse's email, stating that the structure of these transactions was similar to the structure Lillemoe had discussed with FAS personnel in 2009.  *See* First Slusher Decl. ¶ 20; AR 327–29.  Previously, in 2009, Lillemoe had presented to FAS personnel a certain transaction model it sought to use for

---

[5] As noted in the Court's prior Memorandum Opinion, FAS had concerns about "the risk that two or more parties might each apply for a GSM-102 guarantee based on the same shipment or BL."  *Lillemoe*, 344 F. Supp. 3d at 230.  And in their complaint, the plaintiffs represent that "precautions are taken to prevent the shipment from being double-counted under the program, i.e., not used to obtain multiple GSM guarantees."  Am. Compl. ¶ 24.

exports under the GSM-102 program.  AR 2–19.[6]  Lillemoe asserts that at the meeting, Rowse "assured me in person that FAS did not see anything in the transaction presented that it violated the GSM Regulations."  First Lillemoe Decl. ¶ 36.  But Slusher claims that at the time, FAS officials "did not have a clear understanding of [the structure of the transaction] and its implications."  *Id*. ¶ 5.  And the administrative record supports Slusher's characterization.  For example, Slusher's notes from the meeting have a section entitled "Issues?" that raises questions such as "How does exporter certify that goods are being shipped to foreign buyer on guarantee?"  AR 8–9.[7]  According to Slusher, FAS did has "not approved" any structure similar to the one shown at the 2009 meeting.  First Slusher Decl. ¶ 20.[8]

Larsen's response to Rowse further stated that "GTR is not familiar with involvement by [the Ex-Im Bank] in connection with the goods" covered by the guarantees at issue.  AR 327.  But Larsen never explained why the bills of lading were duplicated in separate transactions.

While FAS had been investigating the issue with the Ex-Im Bank, GTR submitted 15 new GSM-102 applications on October 24, 2012.  First Slusher Decl. ¶ 14.  On November 20,

---

[6] The plaintiffs allege in the complaint that the diagram they showed FAS personnel at this meeting represented a "rented trade flow."  *See* Am. Compl. ¶ 28.

[7] Subsequent emails from FAS personnel also show they had questions about the model that Lillemoe presented in 2009.  On May 13, 2009, one FAS official wrote that the flow chart shown by Lillemoe "is in negation to our regulations."  AR 13.  Another wrote "[m]y opinion is yes it does violate the Regulations because the party listed as the importer on the Guarantee is not in fact the importer of record, and the goods are not shipped to the Importer."  AR 17.  Slusher herself wrote at the time "we are all struggling with it."  *Id*.

[8] Larsen's email on November 8, 2012 also included a chart mapping out the structure of the 2012 transactions, but this chart was different than the one presented to FAS in 2009.  AR 333.  The 2012 transactions included an additional step in the flow of goods, whereby the GSM Importer would sell the goods back to the GSM Exporter.  *Id*.  Slusher says this "raised a concern for FAS that Mr. Lillemoe's transactions did not constitute a shipment to the importer."  Second Slusher Decl. ¶ 11.

2012, not even two weeks after the correspondence between Rowse and Larsen about the issues with the prior 12 applications, Larsen emailed Rowse asking when GTR's 15 new applications would be approved.  *See* First Slusher Decl. ¶ 21; AR 409–10.  Rowse asked to set up a phone call to discuss the new applications, but Larsen requested that their correspondence remain in writing.  First Slusher Decl. ¶ 22; AR 412.  Accordingly, Rowse subsequently posed a series of questions to Larsen on December 4, 2012.  First Slusher Decl. ¶ 23; AR 473.  The first question asked GTR to explain discrepancies in cattle prices.  *Id*.  The second laid out the structure described in Larsen's November 8, 2012 email and asked GTR how this transaction "constitute[d] an export of any cattle under the payment guarantee."  *Id*.  The third asked "how cattle shipped by AzTx to Bryansk Meat Company as consignee and notify party can be used by GTR, LLC as evidence that goods were shipped from the U.S. to the named importer on the payment guarantee, A. Charles Trading" and "what relationship exists between Bryansk and A. Charles Trading."  *Id*.

In a December 7, 2012 email, Larsen addressed Rowse's first question but not the second two, and instead referred Rowse to his November 8, 2012 email.  AR 477.  Larsen again followed up with Rowse on December 11, 2012, stating that "the pending applications present nothing new or novel in any respect" from the plaintiffs' earlier applications.  AR 479.

On December 28, 2012, Rowse sent Lillemoe and Larsen an email rejecting the 15 pending GSM-102 applications.  AR 485–86.  Rowse noted that, based on GTR's other 12 guarantees that overlapped with the Ex-Im Bank transaction, he had reason to believe the applications' statement that "the commodity will be shipped directly to the importer in the destination country" was not correct.  *Id*.  He stated that "[a]s Mr. Larsen indicated that the pending applications present nothing new or novel, I can only conclude that these are based upon

the same transaction structure" as the previous 12 applications that FAS had been investigating, finally stating that "any future applications utilizing the same structure will also be denied." *Id*.

FAS's decision to reject GTR's 15 applications based on Rowse's lack of response was not arbitrary and capricious. FAS had legitimate concerns about the prior 12 transactions, since these bills of lading had also been used in conjunction with the Ex-Im Bank transaction. In light of these concerns, FAS was reasonable in scrutinizing GTR's other transactions—in which millions of government dollars were at stake—more closely. FAS accordingly proceeded rationally by asking GTR addition questions relating to the 15 new applications. *See id*. ¶ 23. And when Lillemoe's attorney failed to supply additional documents or answers to these questions, FAS had reason to believe that the 15 applications could also raise similar problems as the earlier 12 applications. Because "agency's path may reasonably be discerned" from the information provided in Slusher's declaration and in the administrative record, *see Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993), FAS did not act arbitrarily and capriciously when it denied the plaintiffs' 15 GSM-102 guarantee applications.

The record also supports Slusher's assertion that FAS did not treat the plaintiffs differently than other GSM-102 program participants. *See id*. ¶ 32. Several months after Rowse's letter to Lillemoe, FAS also raised concerns with Cargill, GSTS LLC, and Grove Services, Inc. about the same transaction structure, in which the commodities were not shipped to the importer on the GSM-102 application. On November 8, 2012, Rowse told Cargill that FAS was "no longer feeling comfortable with" the type of transaction where Cargill is not the shipper. AR 447. On August 21, 2013, Rowse told Cargill that FAS "only see[s] application so [it doesn't] necessarily know what everyone else is doing" and that "exporters must certify they are shipping to importer." AR 614. On September 30, 2013, FAS personnel "conducted

conversations" with GSTS and Grove Services similar to those they had with Lillemoe.  First

Slusher Decl. ¶ 39.  Those conversations were prompted by a review of live animal transactions

to Russia that FAS conducted from May 2013 to September 2013 to "determine whether there

were similar issues as those identified in October 2012" with respect to GTR's transactions that

were flagged by the Ex-Im Bank.  *Id*.  For GSTS, Rowse "questioned certain anomalies evident

in the guarantee application" such as the application indicating that GSTS was shipping directly

to the importer, while "the bills of lading indicate[d] lots of different consignees."  *Id.* ¶ 39; *see

also* AR 662.  For Grove Services, Rowse asked Grove to certify that the "goods/cattle will be

shipped to importer in Russia."  AR 664.  Because there were multiple parties on the bills of

lading, he asked whether there was a contractual relationship between Grove, the intervening

purchaser and the importer.  *Id.*; *see also* First Slusher Decl. ¶ 40.  He continued that he was

"concerned about cert[ifications] and who is moving cattle."  AR 664.  These conversations,

while perhaps not as formal as the letter to the plaintiffs, show that FAS employees had similar

conversations with other participants and treated the plaintiffs in a similar manner as those other

participants.

  For his part, Lillemoe asserts in his declaration that other companies, such as GDC,

Grove Services and GSTS engaged in transactions using the "rented trade flow" structure from

2013 to 2016.  First Lillemoe Decl. ¶¶ 48–51.  According to FAS, however, GDC has not

participated in the GSM-102 program since 2012.  Second Slusher Decl. ¶ 21, Dkt. 99-1.  But

even assuming Lillemoe's statement is true, FAS explains—and Lillemoe admits—that the

transactions used in the GSM-102 program were highly complicated, and FAS typically could

not discern the underlying structure of the transaction based on the documents before it.  *See id*. ¶

16 ("FAS cannot tell the structure of a transaction based on the information submitted in an

exporter's GSM-102 application for a payment guarantee."); Second Lillemoe Decl. ¶ 17, Dkt. 103-1.  The GSM-102 program requires that exporters apply before the commodities are shipped. Second Slusher Decl. ¶ 18.  Under the regulations in effect before 2014, the exporter only had to provide FAS with the "name and address of the exporter; name and address of the importer; name and address of the intervening purchaser, if any; and name and location of the foreign bank issuing the letter of credit" as well as "information about the commodity and requested terms of the GSM-102 payment guarantee."  *Id*. ¶ 16; *see also* 7 C.F.R. § 1493.40(a) (2012).  Nothing required program participants to provide information or documents about the underlying structure of the transaction.  Second Slusher Decl. ¶ 16.  And exporters cannot possibly show FAS a bill of lading when they apply to the program, because the commodities have not actually shipped yet.  *Id*. ¶ 18.

Further, the administrative record reveals that FAS was unclear about the transactions and relied heavily on the parties' representations about their structures.  For instance, Rowse told Lillemoe in a January 9, 2013 phone call that "we had neither the resources nor time to preview each transaction and we depended upon the declarations in the application."  AR 536.  Rowse told Cargill at the August 21, 2013 meeting that "[w]e're dependent on what people tell us. We don't do transactional due diligence."  AR 616.  Far from prohibiting a certain type of transaction for the plaintiffs while deliberately authorizing the same for other parties, these conversations show that FAS was not clear about the structures of the transactions it was approving.  Simply because these transactions were not fully vetted by FAS does not mean that FAS acted arbitrarily towards the plaintiffs.

2.      *The Turkey Guarantees*

Next, the plaintiffs allege that they withdrew several Turkey guarantees that FAS had already approved on September 25, 2012, and FAS refused to reimburse the application fees without explanation.  *See* Am. Compl. ¶ 53.  According to the plaintiffs, they withdrew these guarantees because they were concerned that FAS would not honor the guarantees, since FAS had barred the "rented trade flow" structure.  Pls.' Opp'n to Def.'s Renewed Mot. for Summ. J. at 20, Dkt. 93; AR 488–89.  But nothing in the record supports the plaintiffs' assumption that FAS would refuse to honor the guarantees.  Under FAS's governing regulations at the time, once a guarantee was issued, FAS would pay the guarantee it even if it ended in default.  *See* 7 C.F.R 1493.300 (2013).  Indeed, FAS did not retroactively annul the coverage of the plaintiffs' 12 guarantees that the Ex-Im Bank flagged as involving the same bill of lading.  First Slusher Decl. ¶ 31.  According to Slusher, "because the guarantees had already been assigned to a U.S. bank, and FAS had no information indicating that the assignee bank had any knowledge of the underlying defects in the transactions," the regulations required that FAS "honor the guarantees in the event of default."  *Id*.

Further, FAS declined to refund the application fees for the guarantees based on a straightforward application of its regulations.  Under the regulations in place at the time of the Turkey guarantees, FAS's "approval of the application will be final and refund of the guarantee fee will not be made after approval unless the GSM determines that such refund will be in the best interest of [the Commodity Credit Corporation]."  7 C.F.R. § 1493.70(d) (2013).  Slusher asserts that "it has always been FAS policy" that once the Director of the FAS Credit Programs Division signs the payment guarantee, the application is considered approved.  Second Slusher Decl. ¶ 37.  FAS gave GTR the final approval for the Turkey guarantees in September 2012.  *See*

AR 491; AR 508; AR 520.  And FAS applied its longstanding policy by refusing to refund

application fees on guarantees that it had approved months before Lillemoe attempted to

withdraw them.  FAS thus acted reasonably toward the plaintiffs when it declined to reimburse

the application fees on the Turkey guarantees.

3.     *The Bancolombia Guarantees*

The plaintiffs also invoke FAS's delay in approving the Bancolombia guarantees as

further evidence that FAS treated GTR differently than other program participants.  *See* Am.

Compl. ¶ 56–58.  GTR submitted the three Bancolombia applications on December 14, 2012 and

December 17, 2012.  *See* First Slusher Decl. ¶ 33; AR 548; AR 563; AR 574.  On January 9,

2013, Rowse called Lillemoe and explained that these applications contained a statement that

"the goods would be shipped directly to his importer."  AR 536.  He told Lillemoe that if he was

comfortable with these certifications, FAS would approve them.  *Id*.  On January 10, 2013,

Lillemoe sent Rowse an email that he was comfortable with the transactions, *see* AR 538, and

Rowse directed his staff to approve the applications, *see* AR 540.  The plaintiffs then canceled

these guarantees 2.5 hours later.  AR 542.  The record does not indicate that FAS treated these

applications differently by delaying their approval.  Rather, FAS had concerns about whether,

following the Ex-Im Bank issue just three months prior, GTR could certify that the goods would

be shipped directly to the importer.  FAS raised the issue with Lillemoe, and once he signed off

on it, FAS approved the applications almost immediately.  The record contains no evidence that

FAS unduly delayed these applications because it was selectively enforcing a policy against the

plaintiffs.

The plaintiffs also argue that once GTR canceled the guarantees, FAS "inexplicably

refused" to refund the fees associated with only one of them.  *See* Pls.' Opp'n to Def.'s Renewed

Mot. for Summ. J. at 21.  But again, in evaluating whether to refund the fees, FAS directly applied its own regulations.  By the time the plaintiffs canceled the Bancolombia applications, Rowse had only signed one of them, so only one was considered approved under FAS policy. *See* Second Slusher Decl. ¶ 37; *see also* AR 587–89.  Because Rowse had not yet signed the other two guarantees, FAS refunded the fees corresponding with those applications.  Second Slusher Decl. ¶ 37.  FAS's "decision to hold to its bright-line test," *see* Pls.' Reply in Support of its Mot. for Discovery at 25, Dkt. 103, is hardly an arbitrary action—FAS applied its established policy in a way that was consistent with its own binding regulations.  FAS therefore acted reasonably with respect to the Bancolombia guarantees.

4.    *The Deutsche Bank Guarantees*

The plaintiffs' final example of discriminatory treatment is FAS' alleged interference in its relationship with Deutsche Bank.  *See* Am. Compl. ¶¶ 72–74.  According to the plaintiffs, in December 2013, Rowse raised issues with Deutsche Bank about discrepancies in GTR's documents and caused Deutsche Bank to cease doing business with the plaintiffs.  *See* Pls.' Opp'n to Renewed Mot. for Summ. J. at 22–23.

But the administrative record shows that FAS treated GTR reasonably with respect to its interactions with Deutsche Bank.  On November 25, 2013, Rudy Effing, a Deutsche Bank employee, contacted FAS because it noticed discrepancies in certain documents that the plaintiffs had presented to it in connection with several GSM-102 guarantees.  First Slusher Decl. ¶¶ 48–49; AR 666.  The email listed five discrepancies in the documents submitted by the plaintiffs.  *Id*.  Previously, FAS had issued seven guarantees to the plaintiffs that they sought to assign to Deutsche Bank.  AR 727–28.

On December 4, 2013, Deutsche Bank sent a second email to FAS with revised documents that GTR had given it.  AR 872–78.  In these revised documents, the bills of lading "appeared to have been altered from the original set" and certain contract numbers appearing on the bills of lading originally submitted "had been removed from the revised set of documents." Second Slusher Decl. ¶ 41; *see also* AR 684–86; AR 875–77.  Later that day, FAS had a call with Effing, and according to Slusher's notes from that call, Rowse indicated that based on the documents, he had questions about "whether sales are compliant" with the GSM-102 program. AR 880.  Effing said that he was "not happy about structure where someone applies for guarantee who is nowhere on the shipping docs." AR 881.

On December 6, 2013, Rowse and Lillemoe held a telephone conversation in which Rowse told Lillemoe he had discussed the problems with the documents with Deutsche Bank. First Slusher Decl. ¶ 53.  During that call, Rowse raised the altered bills of lading with Lillemoe, and Lillemoe denied changing them.  AR 889–91.  Rowse also told Lillemoe that FAS had not yet determined whether the problems invalidated the guarantee, and Lillemoe said he would move forward with the transactions if Deutsche Bank accepted assignment.  AR 891.  On December 10, 2013, Lillemoe told FAS that Deutsche Bank would not accept assignment for the seven GTR guarantees.  First Slusher Decl. ¶ 54; AR 727–28.

The record shows that Deutsche Bank approached the FAS with issues about discrepancies in the plaintiffs' documents, and FAS acted reasonably by conducting conversations with the relevant parties: Lillemoe and Deutsche Bank.  Rowse was up front with Lillemoe about his discussions with Deutsche Bank, and he did not indicate either way whether FAS would annul coverage of the guarantees.  In fact, FAS never annulled coverage on the guarantees, First Slusher Decl. ¶ 56, and Deutsche Bank refused to take assignment of the

guarantees "of its own accord," *id.* ¶ 54.  The record therefore does not support the claim that FAS was "defaming GTR and Mr. Lillemoe to his business associates and customers and by interfering in his business relationships."  Am. Compl. ¶ 69.

The plaintiffs argue that FAS was the one to initiate contact with Deutsche Bank and raise issues with GTR's transaction structure.  *See* Pl.'s Opp'n at 22.  Plaintiffs' sole support for this claim is Rowse's decision to copy Deutsche Bank on his correspondence about the GTR transaction that was flagged by the Ex-Im Bank in October 2012.  *Id.*  As a preliminary matter, it is eminently reasonable that Rowse copied Deutsche Bank on this email, because Deutsche Bank was the assignee on the transactions that were duplicative with the bills of ladings used for the Ex-Im Bank transactions, and in the event of any default, Deutsche Bank would file any claim for loss with FAS.  *See* Second Slusher Decl. ¶ 13.  Deutsche Bank also continued to do business with GTR after this correspondence.  *Id.* ¶ 14.  In addition, the subsequent communication between Deutsche Bank and FAS occurred over a year after the Ex-Im Bank emails and involved an entirely different set of GSM-102 guarantees.  *Id.* ¶ 38.

The parties appear to dispute whether, on December 4, 2013, Effing told Rowse he "wants to find [a] reason not to pay" on the guarantees, *see* AR 881, or vice versa, *see* Lillemoe Decl. ¶ 60.  But this dispute is not material.  Even assuming Rowse discussed annulling the guarantees with Deutsche Bank, this does not suggest that Rowse was acting arbitrarily toward GTR.  Rather, any such discussion would have been reasonable given the discrepancies Deutsche Bank flagged in GTR's guarantee documentation and FAS's legitimate concern that GTR's bills of lading had been altered.

The plaintiffs also take issue with FAS's decision not to reimburse their application fees on the seven guarantees on which Deutsche Bank refused to take assignment.  *See* Pls.' Opp'n to

Def.'s Renewed Mot. for Summ. J. at 23.  FAS declined to reimburse the application fees for these seven guarantees because, again, based on FAS's regulations and established policy, the guarantees had already been approved by FAS.  The transaction failed because Deutsche Bank refused to accept the assignments, an event that occurred long after FAS approved the guarantees.  In a letter to Lillemoe on April 16, 2014, FAS cited to 7 C.F.R. § 1493.709(d) and noted that "failure of a U.S. assignee bank to accept the payment guarantee is not a circumstance under which CCC refunds payment of fees."  AR 926.  The plaintiffs appealed this decision to the Administrator of FAS, who denied the appeal.  AR 934.  The Administrator told GTR that it was up to Deutsche Bank whether to take assignment of the guarantee, and that nothing precluded the plaintiffs from requesting another U.S. bank to take assignment.  *Id*.  FAS itself conducted a review of the decision to deny the fee reimbursements, and it has provided multiple legitimate reasons to justify its decision.  FAS has thus shown that its conduct with respect to Deutsche Bank was not arbitrary and capricious and that it had legitimate reasons for denying the plaintiffs' request to reimburse their application fees.

## CONCLUSION

For the foregoing reasons, the Court grants in part FAS's Renewed Partial Motion to Dismiss for Lack of Standing, Dkt. 90, and accordingly, the plaintiffs' claims for injunctive relief and for reimbursement of their program fees from the Bancolombia and Deutsche Bank transactions are dismissed without prejudice.  In addition, the Court grants FAS's Renewed Motion for Summary Judgment, Dkt. 89, with respect to the plaintiffs' claim for reimbursement of their program fees from the Turkey transactions.  The Court also denies the plaintiffs' Motion for Discovery, Dkt. 94, and denies as moot FAS's Motion for Protective Order, Dkt. 100.  A separate order consistent with this decision accompanies this memorandum opinion.


_____
DABNEY L. FRIEDRICH
United States District Judge

April 27, 2020